**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**UNITED STATES POSTAL SERVICE, Respondent,**

**American Postal Workers Union, AFL–CIO, Intervenor.**

No. 92–1202.

United States Court of Appeals, District of Columbia Circuit.

Argued Sept. 14, 1993.

Decided Nov. 12, 1993.

Margaret G. Neigus, Atty., N.L.R.B., Washington, DC, argued the cause for petitioner. With her on the brief were Howard E. Perlstein, Supervisory Atty., Jerry M. Hunter, Gen. Counsel and Aileen A. Armstrong, N.L.R.B., Washington, DC.

Howard J. Kaufman, Sr. Counsel, U.S. Postal Service, Washington, DC, argued the cause and filed the briefs for respondent.

Anton G. Hajjar, Washington, DC, entered an appearance for intervenor.

Before: MIKVA, Chief Judge, WALD and EDWARDS, Circuit Judges.

Opinion for the Court filed by Circuit Judge EDWARDS.

HARRY T. EDWARDS, Circuit Judge:

In this case, the National Labor Relations Board ("NLRB" or "Board") petitions for enforcement of an order holding that the United States Postal Service ("Postal Service") violated sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("Act" or "NLRA"), 29 U.S.C. §§ 158(a)(1), (5) (1988), in refusing to bargain with the American Postal Workers Union ("APWU" or "Union") over service reductions made in 1988. The Board found that the Union had not clearly and unmistakably waived its right to bargain over the reductions. The Board thus held that the Postal Service committed an unfair labor practice when it rejected the Union's demand to negotiate over this subject, even though the demand was made during the term of an existing collective bargaining agreement ("CBA").

We reverse on the ground that a "waiver" analysis is inapposite to this case. The parties' 1987–1990 collective bargaining agreement authorized the Postal Service unilaterally to change employees' schedules in the

manner at issue in this appeal. Thus, the parties had already bargained over the relevant issues and memorialized the terms of that bargain in their contract. Because the CBA gave the Postal Service the authority unilaterally to implement the disputed service reductions, we deny the petition for enforcement and vacate the Board's decision.

## I. BACKGROUND

The APWU is the collective bargaining representative for a nationwide unit of approximately 270,000 full-time and 70,000 part-time clerical, maintenance, motor vehicle, and special delivery messenger Postal Service employees. The events at issue in this case arose under the 1987–1990 collective bargaining agreement between the Postal Service and the Union, and all references to the "CBA" in this opinion are to that agreement. *See* CBA, *reprinted in* Joint Appendix ("J.A.") 50–154.

Article 7 of the CBA provides for a "regular" work force and a "supplemental" work force. The supplemental work force is made up of casual employees, whose numbers are strictly limited by the CBA and none of whom are members of the APWU. All employees in the regular work force are members of the bargaining unit represented by the Union. The regular work force includes full-time employees, who work a fixed schedule and are guaranteed five eight-hour work days per week, and two classes of part-time employees. "Part-time regulars" work a fixed schedule of less than forty hours per week. "Part-time flexibles" ("PTFs"), on the other hand, have no set hours, but work a variable schedule as the Postal Service needs them. Although the CBA guarantees no specific hours to PTFs, the Postal Service and the Union have agreed that PTFs will receive a minimum of either two or four hours of work per pay period, depending on the size of the facility in which they work. *See* Letter from Brian J. Gillespie, Director, Office of Programs and Policies, to Emmet Andrews, Director, Industrial Relations, APWU (December 23, 1974), *reprinted in* J.A. 423.

The Postal Service implemented the service reductions at issue in this case in re-

sponse to the Omnibus Budget Reconciliation Act of 1987 ("OBRA"). Pub.L. No. 100–203, § 6003, 101 Stat. 1330, 1330–277 to 1330–278 (1987). OBRA required the Postal Service to reduce its operating costs by $160 million in fiscal 1988 and $270 million in fiscal 1989, and to submit its plan for implementing those cuts to Congress by March 1, 1988. OBRA did not mandate that the Postal Service achieve these savings by any specific means, but did forbid it to borrow funds or to increase postal rates.

The Postal Service began planning cost reductions immediately after OBRA's enactment. On December 23, 1987, Postal Service officials met with representatives from the APWU and informed them that the Postal Service planned to close all of its retail outlets on the Saturdays following Christmas and New Year's Day. On January 14, 1988, the APWU and the Postal Service met again and the Union proposed several areas for potential labor costs savings, none of which were accepted. Neither of the parties claims that this or other meetings constituted bargaining sessions.

On January 20, 1988, the Postal Service announced a $160 million reduction in its operating budget. Two-thirds of these savings were due to cuts in non-labor administrative costs and adjustments to work schedules. The remaining third, an estimated $60 million, was to be saved by reducing service hours. In addition to the two previously announced Saturday closings, the Postal Service planned to adjust Sunday mail processing and collection hours, and to reduce retail window hours by approximately one half day per week. The APWU requested bargaining over the proposed service reductions and met with the Postal Service on two occasions following the January 20th announcement. The Postal Service refused to bargain, however, on the grounds that it had authority pursuant to the CBA to implement the reductions unilaterally. In September 1988, the Postal Service partially restored the retail services it had reduced in response to OBRA. The APWU again requested bargaining and the Postal Service again refused.

The Board and the Postal Service largely agree on the effects of the service reductions on bargaining unit employees. First, no unit employees were laid off as a result of the OBRA reductions. Second, there were no changes in the number of hours worked by full-time employees, whom the CBA guarantees forty hours per week. Full-time employees could, however, have faced changes in their scheduled days off, or otherwise rearranged workweeks.[1] Third, the Board does not contend that part-time regular employees worked fewer hours as a result of the service reductions. The parties agree that if there was in fact any reduction in work hours due to the service reductions, it was borne solely by PTFs. On this score, the Board points to the testimony of a postal official that the average PTF worked 15 minutes less per week after the service reductions were implemented. Brief for Petitioner at 8 (citing J.A. 28, 225, 1366). The Postal Service counters that the service reductions achieved cost savings through reduced hiring of PTFs, attrition and reduced overtime, and that PTF hours were in fact higher in fiscal year 1988 than in 1987. *See* Reply Brief for Respondent 15–17. It is unnecessary for us to determine the precise effect of the service reductions on PTFs. Rather, it will suffice to note that neither the Board nor the APWU contends that PTF hours fell below the two or four hour weekly minimums guaranteed by the Union's agreement with the Postal Service.

The Administrative Law Judge ("ALJ") dismissed the Union's unfair labor practice charge in its entirety on the ground that the service reductions were not mandatory subjects of bargaining because they were implemented in response to a congressional mandate. *See United States Postal Service*, 306 N.L.R.B. 640, 652 (1992) ("NLRB Decision") (reprinting ALJ decision). The NLRB reversed, holding that the service reductions were mandatory subjects, and that the APWU had not waived its right to bargain over them.

1. Articles 12 and 37 of the CBA require the Postal Service to "post" positions when their schedules change so that employees can bid to take the rescheduled positions. The Union and the Postal Service agreed to give APWU locals

The Board held that the service reductions "amounted to a decision to reduce work hours—a matter literally within the scope of an employer's obligation to bargain as defined in Section 8(d) of the Act." *Id.* at 642. The Postal Service contended before the Board, as it does before this court, that Article 3 of the CBA gave it the power to implement the service reductions without first bargaining with the Union. Article 3 is a broadly-worded management rights clause, the full text of which reads as follows:

### Management Rights

The Employer shall have the exclusive right, subject to the provisions of this Agreement and consistent with applicable laws and regulations:

A. To direct employees of the Employer in the performance of official duties;

B. To hire, promote, transfer, assign, and retain employees in positions within the Postal Service and to suspend, demote, discharge, or take other disciplinary action against such employees;

C. To maintain the efficiency of the operations entrusted to it;

D. To determine the methods, means, and personnel by which such operations are to be conducted;

E. To prescribe a uniform dress to be worn by letter carriers and other designated employees; and

F. To take whatever actions may be necessary to carry out its mission in emergency situations, i.e., an unforeseen circumstance or a combination of circumstances which calls for immediate action in a situation which is not expected to be of a recurring nature.

The Board rejected the Postal Service's argument, holding that Article 3 did not amount to a waiver by the APWU of its right to bargain. Citing *Metropolitan Edison Co. v. NLRB*, 460 U.S. 693, 708, 103 S.Ct. 1467, 1477, 75 L.Ed.2d 387 (1983), the Board noted

the option of waiving the posting requirements as to schedule changes resulting from the OBRA service reductions, so the CBA's posting provisions are not at issue in this case. *See* Memorandum of Understanding, *reprinted in* J.A. 49.

that a waiver of statutory bargaining rights in a collective bargaining agreement must be "clear and unmistakable." NLRB Decision, 306 N.L.R.B. at 642. The Board held that Article 3 of the CBA could not meet this stringent standard, either by its plain language or as it had been interpreted by arbitrators in previous proceedings. The Postal Service was ordered to bargain over the service reductions and to make unit employees whole for any lost wages the reductions caused.

## II. ANALYSIS

■ Sections 8(a)(5) and 8(d) of the NLRA make it an unfair labor practice for an employer to refuse "to bargain collectively" with its employees' representative concerning "wages, hours, and other terms or conditions of employment." 29 U.S.C. §§ 158(a)(5), (d) (1988). An employer violates sections 8(a)(5) and 8(a)(1) of the Act if it makes a unilateral change in a term or condition of employment—so-called "mandatory subjects"—without first bargaining to impasse. *See, e.g., Litton Fin. Printing Div. v. NLRB,* — U.S. ——, ——, 111 S.Ct. 2215, 2221, 115 L.Ed.2d 177 (1991).

■ However, the duty to bargain under the NLRA does not prevent parties from negotiating contract terms that make it unnecessary to bargain over subsequent changes in terms or conditions of employment. "The union may exercise its right to bargain about a particular subject by negotiating for a provision in a collective bargaining contract that fixes the parties' rights and forecloses further mandatory bargaining as to that subject." *Local Union No. 47, IBEW v. NLRB,* 927 F.2d 635, 640 (D.C.Cir.1991) (citing *UMW Dist. 31 v. NLRB,* 879 F.2d 939, 944 (D.C.Cir.1989); *IBEW Local 1466 v. NLRB,* 795 F.2d 150, 155 (D.C.Cir.1986)). "[T]o the extent that a bargain resolves any issue, it removes that issue *pro tanto* from the range of bargaining." *Connors v. Link Coal Co.,* 970 F.2d 902, 905 (D.C.Cir.1992). This court has referred to this inquiry as an analysis of whether an issue is "covered by" a collective bargaining agreement. *See id.* at 906; *Dep't of Navy v. FLRA,* 962 F.2d 48, 57 (D.C.Cir.1992).

■ A union may also "waive" its right to bargain over a mandatory subject, but the "covered by" and "waiver" inquiries are analytically distinct:

> A waiver occurs when a union knowingly and voluntarily *relinquishes* its right to bargain about a matter; but where the matter is covered by the collective bargaining agreement, the union *has exercised* its bargaining right and the question of waiver is irrelevant.

*Dep't of Navy,* 962 F.2d at 57 (emphasis in original) (interpreting Federal Service Labor–Management Relations Statute). As we explained at length in *Department of Navy,* when employer and union bargain about a subject and memorialize that bargain in a collective bargaining agreement, they create a set of rules governing their future relations. *See id.* Unless the parties agree otherwise, there is no continuous duty to bargain during the term of an agreement with respect to a matter covered by the contract. *See, e.g., United Auto Workers v. NLRB,* 765 F.2d 175, 179–80 (D.C.Cir.1985); *NLRB v. Jacobs Mfg. Co.,* 196 F.2d 680, 683 (2d Cir.1952). Thus, neither the Board nor the courts may abrogate a lawful agreement merely because one of the bargaining parties is unhappy with a term of the contract and would prefer to negotiate a better arrangement. Quite the contrary, the courts are bound to enforce lawful labor agreements as written, *see, e.g., Textile Workers Union v. Lincoln Mills,* 353 U.S. 448, 454–55, 77 S.Ct. 912, 916–17, 1 L.Ed.2d 972 (1957), and they are even bound to enforce voluntary arbitration awards construing labor agreements. *See, e.g., United Steelworkers v. American Mfg. Co.,* 363 U.S. 564, 80 S.Ct. 1343, 4 L.Ed.2d 1403 (1960); *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960); *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). In short, the courts attempt to interpret collective bargaining contracts so as to respect the agreements reached by the parties who made them. Accordingly, questions of "waiver" normally do not come into play with respect to subjects

already covered by a collective bargaining agreement.

■ In a case such as this one, where the employer acts pursuant to a claim of right under the parties' agreement, the resolution of the refusal to bargain charge rests on an interpretation of the contract at issue. *See, e.g., IRS v. FLRA,* 963 F.2d 429, 440 (D.C.Cir.1992). Indeed, "whether there is a duty to bargain depends solely upon what the contract means." *Id.* Normally, under federal labor laws, arbitrators and the courts, rather than the Board, are the primary sources of contract interpretation. *See, e.g., Litton Fin. Printing,* —— U.S. at ——, 111 S.Ct. at 2223. The Board, however, has the authority to interpret collective bargaining agreements in order to resolve unfair labor practice cases. *See NLRB v. C & C Plywood Corp.,* 385 U.S. 421, 427–30, 87 S.Ct. 559, 563–65, 17 L.Ed.2d 486 (1967).

■ In recognition of both the fact that it has authority to interpret collective bargaining agreements only in connection with unfair labor practice charges, and the importance of the principle of freedom of contract in labor law, the Board has long had a policy of deferring to arbitration when a contract provides for that means of dispute resolution. Under the policy first enunciated in *Collyer Insulated Wire,* 192 N.L.R.B. 837 (1971), and approved by this court in *Hammontree v. NLRB,* 925 F.2d 1486 (D.C.Cir.1991) (en banc), when the parties to a dispute have provided for arbitration, the Board will not begin an unfair labor practice proceeding until arbitration has run its course. Under a closely related policy, the Board also defers to the *results* of arbitration, so long as those results meet certain general criteria designed to insure fairness and consistency with the NLRA. *See Hammontree,* 925 F.2d at 1490–91 (discussing Board's deference policies); *see also American Freight System, Inc. v. NLRB,* 722 F.2d 828, 831–33 (D.C.Cir.1983) (Board required to follow its policy by deferring to grievance committee decision denying relief to fired employee); *Fournelle v. NLRB,* 670 F.2d 331, 341–45 (D.C.Cir.1982) (Board required to follow its policy by deferring to prior arbitration decision permitting selective discipline of union officials). Article

15 of the CBA at issue in this case does specify detailed arbitration procedures. In this case, however, the Postal Service did not argue before the ALJ, the Board, or this court that the Board should have deferred to arbitration in this dispute. The Postal Service also did not argue at any stage of this case that the Board should have a policy of deferring *sua sponte,* and we do not decide that question. Although the Board is not the ultimate arbiter of contract disputes, it is clear that, in this case, the Board had the authority to interpret the CBA to resolve the pending unfair labor practice charge.

■ The Board's limited role in interpreting contracts has important implications for our review of its decision in this case, however. Because the courts are charged with developing a uniform federal law of labor contracts under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1988), we accord no deference to the Board's interpretation of labor contracts. *Litton Fin. Printing,* —— U.S. at ——, 111 S.Ct. at 2223 (citing *Local Union 1395, IBEW v. NLRB,* 797 F.2d 1027, 1030 (D.C.Cir.1986)). To defer to the Board's contract interpretation would risk the development of conflicting principles for interpreting collective bargaining agreements. *Id.* In keeping with the law of this circuit, we interpret the CBA *de novo. See Local 47,* 927 F.2d at 641.

■ In the instant case, the Board determined that Article 3 of the CBA "neither on its face nor as interpreted by the arbitrators whose decisions were received into evidence, specifically refers to the type of employer decision or mentions the kind of factual situation presented here." NLRB Decision, 306 N.L.R.B. at 643. The Board held that Article 3 was therefore not a "clear and unmistakable" waiver of the Union's right to bargain. Because it applied a waiver analysis without considering that the service reductions might be "covered by" the CBA, the Board never attempted to define the boundaries of the authority granted to the Postal Service by Article 3. Indeed, the Board never analyzed the CBA's language at all, but merely reprinted Article 3 in a footnote.

The Board relies on the fact that nothing in the management rights clause *"specifically refers"* to the "type of employer decision" at issue in this case. We have, however, rejected just such a crabbed reading of the "waiver"/"covered by" distinction. In *Department of Navy,* we rejected two Federal Labor Relations Authority ("FLRA") decisions on the ground that: "Under the 'waiver' approach applied in these cases, a matter is not 'covered by' a negotiated agreement unless the agreement 'specifically addresses' the 'particular subject matter' at issue." 962 F.2d at 58; *accord Link Coal,* 970 F.2d at 906. The FLRA's test (which was something akin to the Board's approach in this case) was found wanting, because it is naive to assume that bargaining parties anticipate every hypothetical grievance and purport to address it in their contract. Rather, a collective bargaining agreement establishes principles to govern a myriad of fact patterns.

In the case before us, it is clear that service reductions are within the compass of Article 3. That provision grants the Postal Service the "exclusive right" "To transfer and assign employees," and "To determine the methods, means and personnel by which [its] operations are to be conducted." Article 3 also gives the Postal Service the more general right "To maintain the efficiency of the operations entrusted to it." These rights surely permit an employer unilaterally to rearrange its employees' work schedules, which the Postal Service contends was the sole result of its service reductions.

The only consequence of the service reductions that the Board alleges, other than schedule changes, is that PTFs lost an average of fifteen minutes of work time per week. Even accepting this assertion as true, neither the Board nor the APWU even attempts to argue that any PTF in the national bargaining unit received less than his or her guaranteed minimum of two or four hours of work per week. The reason that the Postal Service negotiated for a contract provision permitting it to hire PTFs is self-evidently because it wanted a group of workers whose hours would vary according to the Postal Service's needs. The CBA provides that PTFs are to "work flexible hours as assigned by the Employer during the course of a service week." CBA art. 7, sec. 1(A)(2), *reprinted in* J.A. 59. Further, the CBA requires that in the event the Postal Service needs to reduce its staffing, it "Shall, to the extent possible, minimize the impact on full-time positions by *reducing part-time flexible hours."* CBA art. 12, sec. 5(C)(5)(a)(3), *reprinted in* J.A. 71 (emphasis added). The Board is unable to point to a single contractual provision that the Postal Service violated in this case. No unit employees were laid off, no full-time employees worked less than their contractually-guaranteed minimum of forty hours per week, and no part-time regular employees suffered reductions in work hours. Any reduction in work time affected only PTFs, the very workers whom the CBA dictates should bear the effects of such reductions.

## III. CONCLUSION

There is a crucial distinction between "the waiver of a right and the exercise of a right that extends into the future. To the extent that a bargain resolves any issue, it removes that issue *pro tanto* from the range of bargaining." *UMW 1974 Pension v. Pittston Co.,* 984 F.2d 469, 479 (D.C.Cir.1993) (citation and internal quotation omitted), *cert. denied,* ── U.S. ──, 113 S.Ct. 3039, 125 L.Ed.2d 726 (1993). In this case the Board failed even to consider the possibility that the service reductions were covered by the CBA. We conclude that the 1988 service reductions are well within the scope of the powers for which the Postal Service bargained with the APWU. Because the CBA memorializes the terms of that bargain, it covers the dispute before us in this case. The petition for enforcement is therefore denied, and the Board's order is vacated.

*So ordered.*