**BP AMOCO CORPORATION, successor by merger of Amoco Corporation, et al., Petitioners,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Oil, Chemical and Atomic Workers
International Union, AFL–CIO,
et al., Intervenors.

No. 99–1368.

United States Court of Appeals,
District of Columbia Circuit.

Argued May 15, 2000.

Decided July 11, 2000.

Jeffrey S. Heller argued the cause for the petitioners. Stephen D. Erf and Thomas J. Piskorski were on brief.

David Habenstreit, Attorney, National Labor Relations Board, argued the cause for the respondents. Leonard R. Page, General Counsel, Linda Sher, Associate General Counsel, Aileen A. Armstrong, Deputy Associate General Counsel, and David A. Seid, Attorney, National Labor Relations Board, were on brief for the respondents. Anne M. Lofaso, Attorney, entered an appearance.

Patrick M. Flynn entered an appearance for the intervenors.

Daniel V. Yager and Heather L. Mac-Dougall were on brief for the amicus curiae.

Before: WILLIAMS, HENDERSON and ROGERS, Circuit Judges.

Opinion for the court filed by Circuit Judge KAREN LeCRAFT HENDERSON.

1. For convenience "BP Amoco" is used to refer to all Amoco entities, both pre- and post-

KAREN LeCRAFT HENDERSON, Circuit Judge:

The petitioners, BP Amoco Corp., successor by merger to Amoco Corporation, and its subsidiaries (collectively BP Amoco) [1] seek review of a decision and order of the National Labor Relations Board (NLRB, Board) holding that BP Amoco committed an unfair labor practice by unilaterally altering its employee medical benefit plan in violation of the collective bargaining agreements between Amoco Corporation and five locals of Intervenor Paper, Allied Chemical and Energy Workers International Union, successor to the Oil, Chemical and Atomic Workers International Union (collectively identified as Union). Because the collective bargaining agreements expressly incorporated the company benefit plan, which in turn expressly reserved to BP Amoco the right to amend the plan at any time, we conclude BP Amoco did not commit an unfair labor practice. Accordingly, we grant BP Amoco's petition for review and deny the Board's cross-application for enforcement.

I.

This dispute involves the medical benefit coverage BP Amoco provides to employees at its facilities in Texas City, Texas, Wood River, Illinois and Yorktown, Virginia. From 1984 until 1989 BP Amoco provided these employees medical benefit coverage under its "Comprehensive Medical Expense Plan" (CMEP), a traditional indemnity plan under which participants chose their own medical providers and received specific benefits subject to fixed deductibles. The CMEP expressly reserved to BP Amoco the "right to amend[,] modify, suspend or terminate" the plan "at any time." Joint Appendix (JA) 489, 494.

During contract negotiation in 1989 and 1990, BP Amoco and the Union agreed to replace the CMEP with the "Amoco Medical Plan" (AMP), a similar indemnity plan.

merger.

The AMP contained the following reservation of rights provision:

> The company expects and intends to continue these plans indefinitely. However, the company reserves the right to amend or terminate these plans at any time and for any reason. If any of these plans are amended or terminated, you and other active employees may not receive benefits as desribed [sic] in other sections of this book. You may be entitled to receive different benefits, or benefits under different conditions. However, it is possible that you will lose all benefit coverage. This may happen at any time, even after you retire, if the company decides to terminate a plan or your coverage under a plan. In no event will you become entitled to any vested rights under these plans.

JA 654. Pursuant to this provision, BP Amoco amended the plan in 1991 and 1992 by distributing amending documents to employees but the amendments did not affect the reservation of rights provision.

During contract negotiation in 1992 and 1993, BP Amoco announced its intent to adopt some form of managed care health plan to replace the indemnity plan. In January 1993 BP Amoco issued a bulletin to plan participants informing them of the planned change. Additional bulletins were issued later in the spring providing details of the proposed managed care features and of two other changes affecting retiree benefits.

After the Union demanded bargaining on the plan changes, BP Amoco met with the various locals to discuss the matter throughout the summer. The Union, however, offered no proposals and in September 1993 BP Amoco declared an impasse. BP Amoco implemented the modified plan effective October 1, 1993.

The Union filed charges on behalf of its locals[2] and the NLRB issued four complaints based thereon, which were consoli-

dated. In October and November 1994 the administrative law judge (ALJ) conducted a four-day hearing. In a decision issued March 17, 1995 the ALJ concluded there was no unfair labor practice because the Union was "bound" by the AMP's reservation of rights clauses which had been "adopt[ed]" in the collective bargaining agreements. 1999 WL 671774, at *12 et seq.

The NLRB General Counsel and the Union filed exceptions. In a decision dated August 18, 1999, the Board reversed the ALJ and held that BP Amoco had violated section 8(a)(1) and (5) of the National Labor Relations Act (Act). *Amoco Chem. Co.*, 328 N.L.R.B. No. 174, 1999 WL 671774 (1999). BP Amoco petitioned for review of the Board's decision and the Board cross-applied for enforcement.

## II.

Section 8(a)(1) of the Act makes it generally an unfair labor practice for an employer "to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in the [Act]." 29 U.S.C. § 158(a)(1). Section 8(a)(5) more specifically makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees." *Id.* § 158(a)(5). "An employer violates sections 8(a)(5) and 8(a)(1) of the Act if it makes a unilateral change in a term or condition of employment—so-called 'mandatory subjects'—without first bargaining to impasse." *NLRB v. United States Postal Serv.*, 8 F.3d 832, 836 (D.C.Cir.1993) (citing *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 111 S.Ct. 2215, 115 L.Ed.2d 177 (1991)). "However, the duty to bargain under the [Act] does not prevent parties from negotiating contract terms that make it unnecessary to bargain over subsequent changes in terms or conditions of employment." *Id.* Thus, the parties may negotiate " 'a provision in a collective bargaining contract that fixes

---

**2.** On August 20, 1993 one of the Union's locals filed a grievance over the benefit change. The grievance was denied by the arbitrator on October 2, 1994.

the parties' rights and forecloses further mandatory bargaining as to that subject.' " *Id.* (quoting *Local Union No. 47, Int'l Bhd. of Elec. Workers v. NLRB*, 927 F.2d 635, 640 (D.C.Cir.1991); other citations omitted). " '[T]o the extent that a bargain resolves any issue, it removes that issue *pro tanto* from the range of bargaining.' " *Id.* (quoting *Connors v. Link Coal Co.*, 970 F.2d 902, 905 (D.C.Cir.1992)). "This court has referred to this inquiry as an analysis of whether an issue is 'covered by' a collective bargaining agreement." *Id.* (citing *Connors*, 970 F.2d at 906; *Department of Navy v. Federal Labor Relations Auth.*, 962 F.2d 48, 57 (D.C.Cir.1992)).

In this case BP Amoco contends the terms of the AMP were "covered by" the collective bargaining agreements between BP Amoco and the locals because each agreement incorporated the AMP by reference, including its reservation of rights provision. This incorporation, BP Amoco maintains, removed the AMP's terms from the range of mandatory bargaining so that BP Amoco's unilateral modification of the plan's terms was not an unfair labor practice.

■ Below, as in past decisions, the Board incorrectly applied a "waiver analysis," concluding that the Union had not made a "clear and unmistakable waiver" of its right to bargain over health benefits. 1999 WL 671774, at *3–4. As this court explained in *United States Postal Serv.*:

> [T]he "covered by" and "waiver" inquiries are analytically distinct:
>
> A waiver occurs when a union knowingly and voluntarily *relinquishes* its right to bargain about a matter; but where the matter is covered by the collective bargaining agreement, the union has exercised its bargaining right and the question of waiver is irrelevant.

8 F.3d at 836 (quoting *Department of Navy v. Federal Labor Relations Auth.*, 962 F.2d 48, 57 (D.C.Cir.1992); emphasis

in original). Here, the Board acknowledges the force of the "covered by" principle but contends it does not apply because the Board's decision expressly found that the collective bargaining agreements did not incorporate the reservation of rights clauses. For the reasons set out below, we agree with BP Amoco that the reservation of rights provision was incorporated into the five collective bargaining agreements and that therefore BP Amoco's authority to modify the AMP without mandatory bargaining was "covered by" the agreements.

■ Courts generally "accord a very high degree of deference to administrative adjudications by the NLRB," *United Steelworkers of America, AFL–CIO–CLC, Local 14534 v. NLRB*, 983 F.2d 240, 244 (D.C.Cir.1993), but "[b]ecause the courts are charged with developing a uniform federal law of labor contracts under section 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (1988), we accord no deference to the Board's interpretation of labor contracts." *United States Postal Serv.*, 8 F.3d at 836 (citing *Litton Fin. Printing*, 501 U.S. at 203, 111 S.Ct. 2215 (citing *Local Union 1395, Int'l Bhd. of Elec. Workers v. NLRB*, 797 F.2d 1027, 1030 (D.C.Cir.1986))). Accordingly, we construe *de novo* the language of the collective bargaining agreements here to determine whether they incorporate by reference the AMP's reservation of rights provision. *See id.* We conclude that they do.

The two Texas City, Texas agreements recite that specified "Employee Benefit Plans," including the "Amoco Medical Plan," "are generally set forth in the current Benefits Plan Booklet[s]," although "it is understood that certain provisions in the Booklet have been superseded by negotiation between the parties." JA 981, 1221.[3] The Wood River, Illinois, and Yorktown, Virginia facilities' agreements provide: "Benefit plans for the Company ... will

---

**3.** Each of the agreements set forth specific    superseding provisions. *See* JA 981, 1221.

continue in force during the life of this Agreement with the understanding that these Plans may be bargained upon but will not be subject to arbitration." *Id.* at 828, 874, 916.[4] In each case, the quoted language explicitly makes the plans a part of the collective bargaining agreement, subject to specific, negotiated variations. The Board itself acknowledged as much when it stated "the AMP summary plan description is a *primary reference* for identifying the medical insurance benefits that the Respondent has *contractually* agreed to provide unit employees." 1999 WL 671774, at *4 [JA 1532] (emphasis added).

Because the agreements incorporated the AMP generally, they incorporated all of the plan's provisions not expressly superseded in the agreements, including the reservation of rights clause. As we noted in *Air Line Pilots Ass'n, Int'l v. Delta Air Lines,* 863 F.2d 87 (D.C.Cir.1988): "It is generally held that '[w]hen a document incorporates outside material by reference, the subject matter to which it refers becomes part of the incorporating document just as if it were set out in full.'" 863 F.2d at 94 (quoting *Cunha v. Ward Foods, Inc.,* 804 F.2d 1418, 1428 (9th Cir.1986)). In *Mary Thompson Hosp.,* 296 N.L.R.B. 1245, 1247 (1989), *enf'd,* 943 F.2d 741 (7th Cir.1991), the Board itself noted that "[t]he word 'incorporate' means, of course, that all provisions of the plan become part of the contract itself." Specifically, the Board concluded there that by incorporating the plan, "the Union affirmatively

agreed that the [employer] could terminate its pension plan at any time," as the employer was authorized to do under the plan's reservation of rights clause. *Id.* "[T]he right of the [employer] to do so, free and clear of mandatory consultation or of union objections, was contractually established." *Id.* The same result obtains here. There was no need, as the Board suggests, for BP Amoco to separately negotiate the reservation of rights clause before it could become a part of the agreements. No such negotiation was required in *Mary Thompson.*

In sum, the express incorporation of the AMP into the collective bargaining agreements made the plan's reservation of rights clause a part of each agreement and thereby authorized BP Amoco to unilaterally modify the AMP without the Union's consent. This authority was limited only by the parties' "understanding," expressed in the agreements, that the AMP "*may* be bargained upon" and "that certain provisions in the Booklet have been superseded by negotiation between the parties." JA 981, 1221. The only superceding provision in the agreements addressed the proportionate employer and employee plan contributions. BP Amoco's reservation of the right to amend the plan was not superseded and therefore remained a part of the plan as incorporated into the collective bargaining agreements.[5] Because BP Amoco was contractually authorized to amend the plan unilaterally, it committed no unfair labor practice by doing so. Accordingly,[6] the petition for review is granted and

---

4. The Board stated below, inexplicably, that "only three of the five local contracts even mention the summary plan as a source for general description of the AMP's benefits." 1999 WL 671774 , at *2.

5. BP Amoco's reserved authority to "terminate" (as opposed to its right to "amend") seems to be circumscribed, however, under the Wood River, Illinois, and Yorktown, Virginia collective bargaining agreements, each of which requires that the AMP "continue in force during the life of [the] Agreement." JA 828, 874, 916. BP Amoco appears foreclosed by the quoted language (even apart from the

constraints of its own self interest and the mandates of the Employee Retirement Income Security Act) from canceling the AMP altogether, at least for Union employees at these two facilities.

6. In light of our disposition, we need not consider BP Amoco's alternate argument that if there was a bargaining obligation, it was satisfied because BP Amoco bargained to impasse. *See* Pet'r Br. at 34–36; *NLRB v. McClatchy Newspapers, Inc.,* 964 F.2d 1153, 1165 (D.C.Cir.1992) (in banc) ("Generally, once the parties reach a good-faith impasse, the duty to bargain is at least temporarily

the Board's cross application for enforcement is denied.

*So ordered.*

suspended, and the parties, typically the employer, may enact any change in a mandatory subject reasonably contained within its final proposal."). Nor need we consider BP Amo-

co's additional argument regarding the unenforceability of the Board's remedy. *See* Pet'r Br. at 36–41.