# United States Court of Appeals
**FOR THE DISTRICT OF COLUMBIA CIRCUIT**

———

Argued December 11, 2007      Decided May 6, 2008

No. 07-1035

SOUTHERN NUCLEAR OPERATING COMPANY, ET AL.,
PETITIONERS

v.

NATIONAL LABOR RELATIONS BOARD,
RESPONDENT

———

Consolidated with
07-1067

———

On Petition for Review and Cross-Application for
Enforcement
of an Order of the National Labor Relations Board

———

*Seth T. Ford* argued the cause for petitioners. With him on the briefs were *Robert H. Buckler* and *Evan H. Pontz.*

*Jeffrey J. Barham*, Attorney, National Labor Relations Board, argued the cause for respondent. With him on the brief were *Ronald E. Meisburg*, General Counsel, *John H. Ferguson*, Associate General Counsel, *Linda Dreeben*, Assistant General Counsel, and *Fred B. Jacob*, Supervisory Attorney.

Before: GINSBURG, HENDERSON, and GRIFFITH, *Circuit Judges*.

Opinion for the Court filed by *Circuit Judge* GRIFFITH.

GRIFFITH, *Circuit Judge*: In 2000, four subsidiaries of the Southern Company made modifications to the health-care and life-insurance benefits of their future retirees without negotiating with their employees' unions. The unions filed unfair labor practice charges against these subsidiaries, and the National Labor Relations Board determined that the subsidiaries violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act by making the changes without bargaining collectively. The subsidiaries petitioned for review, and the Board cross-applied for enforcement of its order.

We grant the petition in part and the cross-application in part. We agree with the Board that the National Labor Relations Act did not leave the subsidiaries free to make the changes to the retirement benefits without first bargaining collectively. We also agree with the Board that the unions did not waive their bargaining rights in the course of their dealings with the subsidiaries. We agree with the subsidiaries, however, that the unions contractually surrendered their bargaining rights with respect to the health-care retirement benefits of three of the subsidiaries. In all other respects, we enforce the Board's order.

## I.

The Southern Company ("Southern") is an electric utility that owns several subsidiary companies. Four of these subsidiaries — the Southern Nuclear Operating Company

("SNOC"),[1] the Alabama Power Company ("APC"),[2] the Georgia Power Company ("GPC"),[3] and the Gulf Power Company ("Gulf")[4] — offer their employees a package of health-care and life-insurance retirement benefits.[5] Unlike pension benefits, which vest while an employee is still working, these so-called Other Post-Retirement Benefits ("OPRBs") vest only if and when an employee actually retires from his employer. An employee who leaves prior to retirement cannot claim the OPRB package.

These OPRBs are described in benefit-plan guides, which are provided to the subsidiaries' employees and their unions. Some of these guides have a "reservation-of-rights clause" that grants the employer the right to "terminate or amend this Plan in whole or in part, including but not limited to any Benefit Option described herein, at any time so long as any participant is reimbursed for any covered expenses already incurred under this Plan."

---

[1] Employees at SNOC's Vogtle and Hatch plants are represented by International Brotherhood of Electrical Workers Local Union ("Local") 84. Employees at SNOC's Farley plant are represented by Local 796, which has delegated its bargaining authority to System Council U-19, a consortium of local unions. *See infra* Part IV.

[2] APC's employees are represented by Locals 345, 833, 904, 391, 801, 841, 1053, 796, and 2077 ("APC Locals"). The APC Locals have delegated their bargaining authority to System Council U-19. *See infra* Part IV.

[3] GPC's employees were, at the time of the events giving rise to this case, represented by Local 1208. GPC is a successor employer to Savannah Electric and Power Company ("SEP"), which was a party to the proceedings before the Board. Once SEP merged into GPC, Local 1208 became part of Local 84.

[4] Gulf's employees are represented by Local 1055.

[5] The benefit policies of the other Southern subsidiaries are immaterial to this case.

The four subsidiaries (collectively "the Companies") and other Southern affiliates decided in 1995 that, effective in 2002, they would make two major changes to the OPRB package. First, they would end their practice of paying all health-care premiums for retirees and would instead pay only 60 to 90 percent of each retiree's premiums up to $7500 annually. Second, they would alter their life-insurance payment policy for retirees by providing $2000 life insurance for every year of a retiree's accredited service, up to a maximum of $50,000. (We will refer to these changes as the "1995 changes" or "1995 modifications.") The changes were to apply to all employees except those who had either already retired or worked a minimum period of time by the effective date. The employers made the changes without giving the employees' unions advance notice or an opportunity to negotiate. Many of the unions acquiesced in the changes, but the unions at Southern's Georgia and Mississippi subsidiaries filed unfair labor practice charges with the National Labor Relations Board ("Board"). *See Ga. Power Co. v. NLRB*, 176 F.3d 494 (11th Cir. 1999), *aff'g without opinion*, *Ga. Power Co.*, 325 N.L.R.B. 420 (1998); *Miss. Power Co. v. NLRB*, 284 F.3d 605 (5th Cir. 2002), *vacating in part and enforcing in part*, *Miss. Power Co.*, 332 N.L.R.B. 530 (2000).

In 2000, the Companies decided to postpone the effective date of the changes until 2006 and to expand the number of employees exempted from the modifications. (We will refer to these decisions as the "2000 changes" or "2000 modifications.") The unions asked to bargain, but the Companies rejected the requests.

The unions filed unfair labor practice charges against the Companies, and the Board determined that their failure to bargain had violated Sections 8(a)(1) and 8(a)(5) of the National Labor Relations Act ("NLRA"). *See S. Nuclear*

*Operating Co.*, 348 N.L.R.B. No. 95, 2006 NLRB LEXIS 539 (2006). The Companies now petition for review, and the Board cross-applies for enforcement of its order. We have jurisdiction under 29 U.S.C. § 160(e)–(f), and must sustain the Board's decision "unless, reviewing the record as a whole, it appears that the Board's factual findings are not supported by substantial evidence, or that the Board acted arbitrarily or otherwise erred in applying established law to the facts at issue." *Int'l Alliance of Theatrical & Stage Employees v. NLRB*, 334 F.3d 27, 31 (D.C. Cir. 2003) (citation omitted).

## II.

The Companies ask us to set aside the Board's conclusion that they were required to bargain collectively before making the 2000 changes. We first consider the Companies' argument that the NLRA left them free to make the changes unilaterally.

Section 8(a)(5) of the NLRA makes it an unfair labor practice for an employer to "refuse to bargain collectively with the representatives of his employees." 29 U.S.C. § 158(a)(5). Section 8(d) requires employers to bargain collectively before introducing changes "with respect to wages, hours, and other terms and conditions of employment." *Id.* § 158(d). An employer violates Section 8(a)(5) by making any unilateral changes to the mandatory bargaining subjects covered by Section 8(d). *NLRB v. Katz*, 369 U.S. 736, 743 (1962).[6] The Companies argue that their

---

[6] A violation of Section 8(a)(5) is also a violation of Section 8(a)(1), which makes it an unfair labor practice for an employer to "interfere with, restrain, or coerce employees in the exercise" of their statutory right to bargain collectively through representatives of their own choosing. 29 U.S.C. § 158(a)(1); *see also Brewers &*

unilateral changes to the OPRBs were permissible because the future retirement benefits of current employees are not mandatory bargaining subjects under Section 8(d). We are not persuaded.

The governing principle is found in *Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co.*, 404 U.S. 157 (1971). In that case, the Supreme Court held that retirement benefits for workers who have already retired are not mandatory bargaining subjects because retirees are not "employees" under the NLRA and are therefore not protected by the Act. *See id.* at 168 ("The ordinary meaning of 'employee' does not include retired workers; retired employees have ceased to work for another for hire."). But the Court also made clear that retirement benefits for current employees *are* mandatory bargaining subjects: "To be sure, the future retirement benefits of active workers are part and parcel of their overall compensation and hence a well-established statutory subject of bargaining." *Id.* at 180. Because the 2000 modifications affected future retirement benefits of current employees, the Companies were required to bargain over them with the unions.

The Companies argue that the statement in *Pittsburgh Plate Glass* about future retirement benefits is a dictum and should not supply a rule of decision in this case. We have more faith than do the Companies in Supreme Court declarations that begin with "To be sure . . . ." *See United States v. Oakar*, 111 F.3d 146, 153 (D.C. Cir. 1997) (stating that "carefully considered language of the Supreme Court, even if technically dictum, generally must be treated as authoritative") (quotation marks omitted). But even if the

---

*Maltsters, Local Union No. 6 v. NLRB*, 414 F.3d 36, 41 (D.C. Cir. 2005).

question were an open one, the Companies' argument fails because "classification of bargaining subjects as 'terms [and] conditions of employment' is a matter concerning which the Board has special expertise." *Local Union No. 189, Amalgamated Meat Cutters & Butcher Workmen of N. Am. v. Jewel Tea Co.*, 381 U.S. 676, 685–86 (1965); *see also Ford Motor Co. v. NLRB*, 441 U.S. 488, 497 (1979) ("Construing and applying the duty to bargain . . . [lies] at the heart of the Board's function."). The Board has decided that future retirement benefits fit in Section 8(d)'s basket of mandatory bargaining subjects. This decision, particularly in light of the Board's expertise, is rational and therefore lawful. *See id.* at 495 (noting that the Board's "judgment as to what is a mandatory bargaining subject is entitled to considerable deference"). No one could doubt that current employees are rightly concerned about the retirement benefits that they will receive in the future. Giving them the right to bargain collectively over those benefits is certainly sensible. Alternatively, the Companies argue that including future *vested* retirement benefits in Section 8(d) might be acceptable, but including future *non-vested* retirement benefits — like the ones here — is unacceptable. It is doubtful, however, that current workers are not affected by the OPRBs merely because the OPRBs are not "vested." The possibility of obtaining the OPRBs by continuing to work for and then retiring from an employer may well induce an employee to continue with that employer and may well affect the present compensation he is willing to accept from his employer. Moreover, in concluding that future retirement benefits for current employees are a mandatory bargaining subject, we are in accord with the other circuit courts that have decided the issue. *See Miss. Power Co.*, 284 F.3d at 614; *Ga. Power Co.*, 176 F.3d 494, *aff'g without opinion*, 325 N.L.R.B. at 420; *Inland Steel Co. v. NLRB*, 170 F.2d 247, 250–51 (7th Cir.

1948); *see also Am. Postal Workers Union v. U.S. Postal Serv.*, 707 F.2d 548, 555 (D.C. Cir. 1983) (dictum).

The Companies also contend that it would be folly to require bargaining because their 2000 modifications did not amount to much. We recognize that "in order for a statutory bargaining obligation to arise with respect to a particular change unilaterally implemented by an employer, such change must be a 'material, substantial, and [] significant' one affecting the terms and conditions of employment of bargaining unit employees." *Alamo Cement Co.*, 281 N.L.R.B. 737, 738 (1986). But if changes to cafeteria prices, *see Ford Motor Co.*, 441 U.S. at 497–98, and the timing of lunch breaks, *see Microimage Display Div. of Xidex Corp. v. NLRB*, 924 F.2d 245, 253 (D.C. Cir. 1991), require bargaining, then we have no trouble concluding that the 2000 changes to retirement benefits do as well.

The Companies suggest that our decision will create a perverse incentive for employers to spring unilateral changes on workers only after they retire, thereby avoiding *Pittsburgh Plate Glass*'s prohibition on unilateral changes to the retirement benefits of future retirees. We are without authority to consider this policy argument, which should be directed to Congress or the Board, not to us.

**III.**

Having found that the NLRA does not shield the Companies' unilateral changes to the OPRBs in 2000, we turn to the Companies' argument that the unions surrendered their right to bargain over the 2000 changes through either waiver or contract.

*A.  Waiver*

"A waiver occurs when a union knowingly and voluntarily *relinquishes* its right to bargain about a matter. . . . [W]hen a union *waives* its right to bargain about a particular matter, it surrenders the opportunity to create a set of contractual rules that bind the employer, and instead cedes full discretion to the employer on that matter. For that reason, the courts require 'clear and unmistakable' evidence of waiver and have tended to construe waivers narrowly." *Dep't of the Navy, Marine Corps Logistics Base v. FLRA*, 962 F.2d 48, 57 (D.C. Cir. 1992). "[C]lear and unmistakable waivers have been inferred from the structure of collective bargaining agreements and from bargaining history showing that the parties have 'consciously explored' or 'fully discussed' the matter on which the union has 'consciously yielded' its rights." *Gannett Rochester Newspapers v. NLRB*, 988 F.2d 198, 203 n.2 (D.C. Cir. 1993) (citations omitted). The Companies contend that the unions, by not negotiating over the 1995 modifications and by not challenging the wording of the reservation-of-rights clauses in the benefit-plan guides, waived their right to bargain over the 2000 changes. We disagree because neither event clearly and unmistakably demonstrates that the unions waived any right they may have had to bargain over the 2000 changes.

The unions' conduct pertaining to the 1995 modifications has no bearing on their right to bargain over the 2000 changes. The two episodes were separate and independent events. The Companies made changes to the OPRBs in 1995; then in 2000, they made another round of modifications. Certainly, nothing in the history of the 1995 changes suggests the unions consciously explored or fully discussed the 2000 changes and then voluntarily relinquished their right to bargain over them. The fact that the unions may have waived their bargaining rights in 1995 — an issue we need not

address — does not undermine their bargaining rights in 2000. As the Board has long held, "[i]t is well settled that even past failure to assert a statutory right does not estop subsequent assertion of that right." *Rockwell Int'l Corp.*, 260 N.L.R.B. 1346, 1347 n.6 (1982); *see also Ciba-Geigy Pharms. Div. v. NLRB*, 722 F.2d 1120, 1127 (3d Cir. 1983) ("Each time the bargainable incident occurs . . . [the] Union has the election of requesting negotiations or not.") (quotation marks omitted); *NLRB v. Roll & Hold Warehouse & Distrib. Corp.*, 162 F.3d 513, 518 (7th Cir. 1998) ("The failure to demand bargaining in the past, without more, does not waive that bargaining right forever.").

The unions' failure to negotiate over the reservation-of-rights clauses is likewise independent of the Companies' 2000 modifications. Nothing in the record suggests that the unions, by not negotiating over the clauses, contemplated waiving their right to bargain in 2000. Absent such indication, we cannot conclude that the unions clearly and unmistakably decided to waive their bargaining rights in 2000.

## *B. Contract*

"[T]he duty to bargain under the NLRA does not prevent parties from negotiating contract terms that make it unnecessary to bargain over subsequent changes in terms or conditions of employment." *NLRB v. U.S. Postal Serv.*, 8 F.3d 832, 836 (D.C. Cir. 1993). In determining whether a union has contractually surrendered its statutory right to bargain, we apply the aptly named "covered by" doctrine: "[T]here is no continuous duty to bargain during the term of [a collective-bargaining] agreement with respect to a matter covered by the contract." *Id.* "[T]he normal deference we must afford the Board's policy choices does not apply in this context . . . ." *Enloe Med. Ctr. v. NLRB*, 433 F.3d 834, 837 (D.C. Cir. 2005).

Instead, "we interpret collective bargaining agreements de novo." *Id.* at 839 n.4.[7]

The Companies' argument is divided into two parts. First, they contend that their collective-bargaining agreements with the unions incorporated the benefit plans' reservation-of-rights clauses on the basis of the unions' "course of conduct." For instance, the Companies suggest that because the unions have copies of the benefit plans and have relied on the benefits provided by those plans, the unions have also incorporated the reservation-of-rights clauses in those plans into the collective-bargaining agreements. Our cases, however, imply that it is only express language in the collective-bargaining agreement that incorporates a reservation-of-rights clause. *Cf. Local Union No. 47, Int'l Bhd. of Elec. Workers v. NLRB*, 927 F.2d 635, 640 (D.C. Cir. 1991) ("The union may exercise its right to bargain about a particular subject *by negotiating for a provision in the collective bargaining contract* that fixes the parties' rights and forecloses further mandatory bargaining as to that subject.") (emphasis added).

Second, the Companies assert that the collective-bargaining agreements incorporated the reservation-of-rights clauses by express reference. Here, the Companies are on firmer ground. In *BP Amoco Corp. v. NLRB*, we held that when a collective-bargaining agreement expressly incorporates a benefit plan, all the plan's clauses, including

---

[7] As we have said many times, "[t]he 'covered by' and 'waiver' inquiries are analytically distinct: A waiver occurs when a union knowingly and voluntarily *relinquishes* its right to bargain about a matter; but where the matter is covered by the collective bargaining agreement, the union has exercised its bargaining right." *BP Amoco Corp. v. NLRB*, 217 F.3d 869, 873 (D.C. Cir. 2000) (quotation marks omitted).

any reservation-of-rights clauses, are also incorporated into the agreement, "thereby authoriz[ing] [the employer] to unilaterally modify the [plan] without the Union's consent." 217 F.3d 869, 874 (D.C. Cir. 2000). In that case, we were faced with several agreements and were asked to decide whether they incorporated benefit plans by reference. Some of the agreements referred to "Employee Benefit Plans" and "Benefits Plan Booklets." *Id.* at 873.[8] Others referred to "[b]enefit plans for the Company." *Id.* at 873.[9] We concluded that "[i]n each case, the quoted language explicitly makes the plans a part of the collective bargaining agreement." *Id.* at 874. Because the plans contained reservation-of-rights clauses that allowed the employer to make unilateral changes, it was free to do so. *Id.* With *BP Amoco* in mind, we consider the Companies' collective-bargaining agreements one by one:

APC: APC's collective-bargaining agreement identifies the health-care plans offered to its employees. Under *BP Amoco*, such direct references incorporate the plans. APC could unilaterally modify its health-care plans because they included a reservation-of-rights clause stating that "[t]he company has the right and may terminate or amend this Plan in whole or in part, including but not limited to any Benefit Option described herein." By contrast, APC was not authorized to modify the life-insurance OPRBs because, regardless whether the collective-bargaining agreement

---

[8] Specifically, they "recite[d] that specified Employee Benefit Plans, including the Amoco Medical Plan, are generally set forth in the current Benefits Plan Booklets." 217 F.3d at 873 (quotation marks omitted).

[9] Specifically, they stated that "[b]enefit plans for the Company . . . will continue in force during the life of this Agreement with the understanding that these Plans may be bargained upon but will not be subject to arbitration." 217 F.3d at 873–74 (quotation marks omitted).

incorporated a life-insurance plan, there is no record evidence of any reservation-of-rights clause relating to life insurance.

GPC: The GPC collective-bargaining agreement states that "the Unions agree to waive negotiations on all issues regarding the 'Georgia Power Company Medical Benefits Plan.' " This language unambiguously forecloses the unions' right to bargain over the medical benefits for GPC employees, regardless whether the agreement also incorporates a reservation-of-rights clause. GPC therefore was authorized to unilaterally modify the health-care OPRBs in 2000.[10] However, the GPC agreement makes no reference to GPC's life-insurance plan, so GPC had no authority to modify its life-insurance OPRBs.

Gulf: The Companies do not argue that the Gulf collective-bargaining agreement incorporates by reference a reservation-of-rights clause. Gulf was therefore not authorized to modify either its health-care or life-insurance OPRBs.

SNOC (Farley plant): The collective-bargaining agreement for the Farley plant refers to SNOC's "insurance plans."[11] Reference in the next sentence of the agreement to "medical insurance rates" suggests that the health-insurance

---

[10] We note that the bargaining-waiver provision in the collective-bargaining agreement does not apply to issues relating to "the ratio of employee and employer contributions" for GPC's medical-benefit plan. However, the Board did not argue that this exception is relevant to the 2000 changes. We therefore have no need to decide whether the exception is applicable to the changes at issue in this case.

[11] The agreement says that Farley employees "will be placed on Southern Nuclear Operating Company's insurance plans at the applicable rates for Southern Nuclear Operating Company as they exist during the life of the agreement."

plan is among the "insurance plans" to which the agreement refers. Though vague, this reference to the health-insurance plan is clearer than the references in *BP Amoco* that we used to find that the insurance plan was part of the collective-bargaining agreement. The reservation-of-rights clause in the Farley health-care plan states that "[t]he company has the right and may terminate or amend this Plan in whole or in part, including but not limited to any Benefit Option described herein." As we concluded with respect to the same clause in APC's health-care plans, that language authorizes the unilateral modification of the health-care OPRBs. But regardless whether the collective-bargaining agreement incorporated a life-insurance plan, we conclude that the Farley plant was not authorized to modify the life-insurance OPRBs because there is no record evidence of any reservation-of-rights clause relating to life insurance.

SNOC (Hatch and Vogtle plants): The collective-bargaining agreement for SNOC's Hatch and Vogtle plants refers to SNOC's "insured benefits."[12] Regardless whether this reference incorporated Hatch's and Vogtle's health-care plans, the two plants were not authorized to unilaterally modify the health-care OPRBs because their health-care plans presented in the record do not include a reservation-of-rights clause.[13] Similarly, they were not authorized to modify the life-insurance OPRBs because the record before us did not include life-insurance plans for either plant.

---

[12] The agreement says that Hatch's and Vogtle's employees would be covered by "Southern Nuclear Operating Company's insured benefits."

[13] Hatch's and Vogtle's health-care plans point only to "page 151 of *Your Guide to Benefits* for more detailed information about . . . how the company may change or terminate the Plan." The record does not include "page 151 of *Your Guide to Benefits.*"

In summary, APC, GPC, and the Farley plant were allowed to unilaterally modify their health-care OPRBs, but Gulf and the Hatch and Vogtle plants were not. None of the Companies was allowed to unilaterally modify the life-insurance OPRBs.

## IV.

The Companies' final argument is that APC and the Farley plant acted lawfully in making their unilateral changes because System Council U-19, which sought to negotiate with those plants, had no authority to bargain on behalf of the plants' employees.[14] Substantial record evidence contradicts this argument. System Council U-19 is a consortium of the nine local unions that represent the employees at APC and the Farley plant. Its bylaws, signed by each of the nine local unions, give the Council "the authority on behalf of its Local Unions to deal with the authorized representatives of the Alabama Power Company as the authorized agent of such Local Unions in all matters pertaining to collective bargaining."[15] Indeed, the purpose behind the creation of System Council U-19 was "to achieve a greater degree of unity and coordinated action between the several Local Unions in collective bargaining with the Employer." There is no basis for the Companies' assertion that System Council U-19 did not have bargaining authority.

---

[14] Although we have already concluded that APC and Farley were free to modify the health-care OPRBs, this argument is still relevant with respect to the life-insurance OPRBs.

[15] System Council U-19's bylaws refer only to APC because U-19 was founded before Farley split away from APC in 1991. We have no reason to believe that the bylaws do not apply to Farley, especially since Local 796 — which represents Farley's employees — is a member of the council.

16

\* \* \*

For the foregoing reasons, we grant the Companies' petition for review and vacate the Board's order with respect to the modifications to the health-care OPRBs for APC, GPC, and the Farley plant; we deny the Companies' petition and enforce the Board's order with respect to the modifications to the health-care OPRBs for Gulf and the Hatch and Vogtle plants, as well as the life-insurance OPRBs for all the Companies.

*So ordered.*