**Revised April 5, 2002**

**IN THE UNITED STATES COURT OF APPEALS
FOR THE FIFTH CIRCUIT**

_____

No. 00-60794

_____

MISSISSIPPI POWER COMPANY,

Petitioner-Cross-Respondent,

versus

NATIONAL LABOR RELATIONS BOARD,

Respondent-Cross-Petitioner.

_____

Petition for Review & Cross Petition for Enforcement
of an Order of the National Labor Relations Board

_____

March 14, 2002

Before GARWOOD and WIENER, Circuit Judges, and VANCE[*], District

Judge.

WIENER, Circuit Judge:

In 1997, an Administrative Law Judge ("ALJ") ruled that the

Petitioner, Mississippi Power Company (the "Company"), had violated

Sections 8(a)(5) and (1) of the National Labor Relations Act (the

"Act")[1] when it refused to bargain collectively over currently

announced but prospectively effective changes in some of the

medical and life insurance benefits to be offered to some of the

Company's future retirees.  In 2000, the National Labor Relations

---

[*] District Judge of the Eastern District of Louisiana,
sitting by designation.

[1] 29 U.S.C. §§ 151 et seq.

Board (the "Board") affirmed the ALJ's rulings, findings, and conclusions, and adopted his recommended order, with modifications.[2] The Company has petitioned for review of the Board's order, and the Board has cross-petitioned for enforcement of its order.

We affirm those aspects of the Board's order grounded in the determination that the Company's announced prospective changes to future retirees' life insurance benefits constituted a violation of the Act. We therefore deny the Company's petition, and enforce the Board's order insofar as it pertains to life insurance.

We conclude, however, that the four locals of the International Brotherhood of Electrical Workers that represent approximately 600 of the Company's 1,400 employees (collectively "the Unions") had expressly waived any right they might have had to bargain over this matter, so the Company did not violate the Act when it declined the Unions' request to bargain over the announced medical insurance changes. Therefore, insofar as the Board's order pertains to medical insurance, we grant the Company's petition, deny the Board's cross-petition for enforcement, set aside the order, and remand to the Board for entry of appropriate orders.

## I. Facts and Proceedings

---

[2] <u>Mississippi Power Company</u>, 332 NLRB No. 52 (2000), 2000 WL 1504672 (N.L.R.B.).

A. The Documents

Before describing the events that gave rise to the instant petition for review, a summary of three documents that are central to this controversy, and the interrelationship of those documents, is in order.

1. The Memorandum of Agreement ("MOA")

The MOA, which was signed by the Company and the Unions, became effective on August 16, 1992 for an initial term of three years. As the bargained-for agreement between those parties, the MOA is a collective bargaining agreement, or, in the vernacular, a CBA. The MOA covers a wide but non-exhaustive range of topics pertinent to the terms and conditions of employment of those employees who belong to the Unions (including, for example, Seniority, Promotion, Layoff, and Discharge; Vacations, Leave of Absence, and Sick Leave; and provisions addressing Grievances and Arbitrations). The MOA does not address traditional employee benefits, such as pension plans, life insurance, or medical insurance, at all.

Following its initial three-year term, the MOA is automatically renewed for one-year extension terms from one August 16 to the next, unless either party notifies the other in writing of non-renewal, at least sixty days prior to the expiration of the then-current term of the agreement. When, in 1995, the Company announced prospective changes in life and medical insurance benefits for some of its future retirees, the MOA was still in its

initial three-year term.

<u>2. The Medical Benefits Plan</u>

The Mississippi Power Company Medical Benefits Plan (the "Medical Benefits Plan") that was in effect in 1995 when the subject changes were announced had become effective on March 1, 1993. It is a Company-drafted document that was executed unilaterally by the Company but by no representatives of the Unions. The Medical Benefits Plan's articles cover numerous topics, such as "Benefit Provisions," "Eligibility for Benefits," and "Plan Administration." Among these articles are two that are pertinent to this controversy: Article IX (Reservations of Rights by the Company and Limitations of Rights of Covered Persons), and Article X (Amendment and Termination of the Plan).

Section 9.1 of Article IX provides:

> 9.1 <u>Plan Voluntary on Part of Company</u>. While it is the intention of the Company that the Plan shall be continued indefinitely and that the Company contributions required hereunder shall be made in each year that the Plan remains in effect, <u>the Plan is entirely voluntary on the part of the Company.</u> [Emphasis ours.]

Article X provides, in relevant part:

> 10.1 <u>Amendment of Plan</u>. <u>The Company...shall have the right at any time by instrument of writing, duly executed, to modify, alter or amend, in whole or in part, the Plan.... The Company makes no promise to continue these benefits in the future and rights to future benefits will never vest.</u> In particular, <u>retirement</u> or the fulfillment of the prerequisites for retirement pursuant to the

4

> terms of any employee benefit plan maintained by the Company <u>shall not confer upon any Employee, Retired Employee</u> or Dependent <u>any right to continued benefits under the Plan</u>. [Emphasis ours.]
>
> 10.2 <u>Termination of Plan</u>. The Company intends that the Plan shall be permanent. <u>However, the Company...has the right to terminate the Plan at any time....</u> After the termination of the Plan..., the Company and the Covered Employees shall have no further obligations to make additional contributions to the Plan.

Thus, the plain and unambiguous language of these sections of the Medical Benefits Plan make clear that the Company has the right to alter, at will and unilaterally, any terms of the Medical Benefits Plan, including the unfettered right to terminate it altogether.

3. <u>The Group Medical Insurance Agreement ("Insurance Side Letter")</u>

The Insurance Side Letter is styled as a two-page offer and acceptance that pre-dated the Medical Benefits Plan and that was signed by the Company on August 15, 1992, the day before the MOA became effective, but that did not become effective itself until it was signed for acceptance by the Unions on December 18, 1992. It is one of several attachments to the MOA. Like the MOA, the Insurance Side Letter is the product of negotiations between the Company and the Unions and is presented as the Company's "offer [that] shall become an agreement when the Union indicates its acceptance hereof." Following the portion describing the offer and the Company's signature, and above the Unions' acceptance

5

signatures, is the boldface title, **"Group Medical Insurance Agreement."** The Insurance Side Letter does not expressly refer by title to the Company's medical benefits plan that was in place when the Side Letter was executed; it could not refer to the Medical Benefits Plan because it was not yet in existence. Thus the Insurance Side Letter is a generic agreement applicable to any group medical insurance that might be in place from time to time during the term of the MOA. None contest, however, that the Insurance Side Letter was applicable to the Medical Benefits Plan at the time in April 1995 when the prospective changes to that plan were announced.

In the Insurance Side Letter, the Company agrees to pay "seventy percent of the cost of group medical insurance coverage" for each participating employee and either one dependent or the employee's family, or $92.80 for a single employee's coverage; and the Company further agrees to pay seventy percent of any increase in premium costs "in the event of any increase in premiums for the above insurance." As consideration for this commitment, the Company extracts an offsetting commitment — called a "condition" — from the Unions:

> [1] the matter of insurance <u>coverage</u> or [2] <u>change in the Company's contribution</u> toward the premium for insurance coverage of its employees <u>shall not be subject to bargaining or a request for bargaining by the Union until the expiration of the Memorandum of Agreement</u>, except by mutual consent. [Emphasis and

6

enumeration ours.][3]

The mutual agreements in the Insurance Side Letter —— the Company's payment obligation and the Unions' agreement that neither coverage nor premium payments would be the subject of bargaining —— are specified to run co-extensively with the MOA's initial term and all annual renewals, unless modified or terminated according to procedures identical to those specified in the MOA, as outlined above. And, just as does the MOA, the Insurance Side Letter stipulates that "[u]ntil the parties have agreed upon such changes the provisions of the agreement shall remain in full force and effect."

4.  Interrelationship of the Documents

As noted, the bilateral MOA does not address traditional employee benefits, such as pensions, life insurance, or health insurance. On the opposite end of the contractual spectrum, the

---

[3] The Unions' agreement regarding bargaining about medical insurance during the original term of the MOA and all extensions extends to only two aspects of such insurance: (1) anything to do with coverage, and (2) the Company's financial commitment to pay portions of the premiums on any such insurance. As the Company bound itself to pay a specified percentage or dollar amount of all medical insurance premiums as well as a percentage of increases in premiums occurring during the initial term of the MOA and all extensions, the negating of bargaining over any "change in the Company's contribution" must pretermit only the Unions' right to seek to bargain for greater premium contributions by the Company during that term. In contrast, the Insurance Side Letter's negating of bargaining over "the matter of insurance coverage" is unrestricted as to the type and extent of coverage, or, indeed, to coverage vel non; the clause pretermits the Unions' seeking to bargain about anything to do with coverage during the term of this agreement.

7

Company's unilateral Medical Benefits Plan is an ERISA welfare benefit plan which provides an employee benefit that, by the plan's own terms, can be changed from time to time or even terminated altogether by the Company, acting alone. The third document, the Insurance Side Letter, has features of both: Like the MOA, the Insurance Side Letter is a bilateral agreement executed by both the Company and the Unions; like the Medical Benefits Plan, however, it relates only to the Company's unilaterally granted employee benefit of medical insurance, and then only to (1) premium payments and (2) coverage. In essence, this third document links the first two by specifying a quid pro quo between the parties on elements of the two otherwise-unrelated documents. On the one hand, the Unions obtain the Company's commitment to maintain a specified level of financial support not otherwise provided for in either the MOA or any medical insurance plan, binding the Company throughout the term of the MOA and all extensions to pay designated percentages or dollar portions of the premiums for medical insurance coverage, as well as designated percentages of any increases in premiums that occur during that period. On the other hand, as consideration for the Company's assumption of such premium payment obligations, the Unions expressly acknowledge that throughout the term of the MOA and any annual renewals, the Unions cannot seek to bargain about either increasing the Company's premium payment commitments or any changes in medical insurance coverage, whether Company-instituted or Unions-requested, those being matters that the Company

8

explicitly reserved to itself under that plan.  Stated differently, the Company committed to a financial obligation it did not have under the MOA regarding partial payments of medical insurance premiums and emphasized a right that it presumably has always enjoyed under its medical insurance plans to change or terminate coverage[4]; in consideration for the Unions' express acknowledgment that they can neither seek to bargain for increased medical insurance premium contributions by the Company nor challenge through bargaining any unilateral changes in coverage of such insurance that the Company might make.  This third document thus serves to bridge the gap between the other two documents — one bilateral and the other unilateral — regarding medical insurance coverage and the Company's contributions to the payment of premiums for such insurance.  It is within the context of this interrelationship of the three documents that we now consider the Company's petition and the Board's cross-petition.

B. The Events

In April 1995, while the MOA and the Insurance Side Letter were still in their initial three-year terms and the Medical Benefits Plan was in effect, the Company called a meeting with the

---

[4] It is likely, of course, that absent the Insurance Side Letter, the Unions would have had a right to seek to bargain over the Company's unilateral changes, even though the Medical Benefits Plan granted to the Company the right to make unilateral changes.  The Insurance Side Letter operates, therefore, to remove any right to  seek to bargain about unilateral changes to medical benefits that the Unions might have held.

presidents of the four locals to announce changes in Company-sponsored insurance coverage, both medical and life, provided to retirees (also called Other Post-Retirement Benefits, or OPRBs). The changes were not to become effective until January 1, 2002. In addition, the changes would not affect any current or future employees who, as of January 1, 2002, shall have either retired or served the Company for 30 years or more (15 years or more if the employee is age 55 or older on January 1, 2002). In other words, the changes would affect only those current and future employees of the Company who, on January 1, 2002, are still working for the Company but shall have been working there for less than 30 years or, if 55 years old or older on that date, shall have been working there for less than 15 years. For each employee who would be affected, the changes linked the Company's premium contribution level to the employee's years of service and placed caps on the Company's contribution to subsequent retirees' medical insurance premiums. Retirees' life insurance benefits were also changed, by replacing the flat $12,500 coverage with a variable amount of life insurance that also was linked to each covered employee's years of employment. In addition, the Company eliminated its policy of subsidizing supplemental life insurance for retirees.

In June 1995, the Unions responded to the Company in writing, requesting bargaining over the OPRB changes in medical benefits. The letter stated, "[W]e feel [these changes] will be a hardship on all current employees in the retirement plan[, and that] this is a

subject for bargaining, and the company has failed to bargain on these issues." The Company declined this request in a letter dated July 18, 1995, saying, "[We] do not feel that the OPRB changes are a mandatory subject of bargaining," whereupon the Unions filed an unfair labor practice charge with the Board, alleging unilateral changes in retirement benefits. Following an investigation of the matter, the Board issued a complaint against the Company, asserting that its refusal to bargain over the OPRB changes constituted a violation of sections 8(a)(5) and (1) of the Act.

An ALJ held a hearing on the complaint and concluded that the Company had violated the Act as charged. Specifically, the ALJ determined that the unilateral OPRB changes did involve a mandatory subject of bargaining; that the prospective changes affected current employees of the Company; and that the Unions had not waived their right to bargain over the OPRBs either by acquiescing in unilateral changes to OPRBs in the past or by accepting the "condition" in the Insurance Side Letter, and thus were not precluded from requesting bargaining by those provisions of the Medical Benefits Plan that acknowledge the Company's capacity to institute unilateral amendment and termination of rights.

The Company filed exceptions to the ALJ's opinion, after which the Board affirmed the ALJ's ruling, albeit for slightly different reasons on some points.[5] The Board agreed with the ALJ's findings

---

[5] Mississippi Power Company, 332 NLRB No. 52 (2000), 2000 WL 1504672 (N.L.R.B.).

that (1) a mandatory bargaining subject and current employees were involved, and (2) the Unions' earlier acquiescence in unilateral changes did not constitute waivers. As for the Medical Benefit Plan's unilateral amendment and termination of benefits provisions, the Board corrected the ALJ's factual finding about the location of the clause,[6] but agreed with the ALJ that these provisions do not reflect an explicit waiver of any right to bargain over the OPRBs. Finally, the Board disagreed with the ALJ's finding that the "condition" expressly accepted by the Unions in signing the Insurance Side Letter was, at most, "ambiguous"; but the Board went on to hold that this condition addressed only _changes_ in benefits _that_ _would_ _go_ _into_ _effect_ _during_ _the_ _term_ of the Insurance Side Letter. Thus, reasoned the Board, the condition was inapplicable to the proposed January 2002 OPRB changes, and therefore was not a waiver of the Unions' right to bargain over those prospective changes.

The Company filed a petition for review of the Board's order, pursuant to 29 U.S.C. § 160(f), after which the Board filed a cross-application for enforcement of the order, pursuant to 29 U.S.C. § 160(e).

## II. Analysis

### A. Standard of Review

---

[6] The ALJ stated that these provisions were in the OPRB changes document, when in fact they are in the Medical Benefits Plan.

The Act provides that the Board's findings of fact shall be conclusive, "if supported by substantial evidence on the record considered as a whole."[7] As to construction of the parties' duty to bargain under section 8(d) of the Act, the United States Supreme Court has said: "Construing and applying the duty to bargain and the language of § 8(d), 'other terms and conditions of employment,' are tasks lying at the heart of the Board's function,"[8] so that "if [the Board's] construction <u>of the statute</u> is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute."[9] Last, we review the Board's construction of labor contracts <u>de</u> <u>novo</u>.[10]

## B. <u>Merits</u>

### 1. The Duty to Bargain

Under the Act, it is an unfair labor practice for an employer "to refuse to bargain collectively with the representatives of his employees."[11] Employers and the employees' representatives have a

---

[7] 29 U.S.C. § 160(e); <u>see also</u> <u>NLRB v. Pinkston-Hollar Construction Services, Inc.</u>, 954 F.2d 306, 309 (5th Cir. 1992).

[8] <u>Ford Motor Co. v. NLRB</u>, 441 U.S. 488, 497 (1979).

[9] <u>Id.</u> (emphasis added) (citing <u>NLRB v. Iron Workers</u>, 434 U.S. 335, 350 (1978) ("The Board's resolution of the conflicting claims in this case represents a defensible construction of the statute and is entitled to considerable deference.")).

[10] <u>BP Amoco Corp. v. NLRB</u>, 217 F.3d 869, 873 (D.C. Cir. 2000); <u>NLRB v. United States Postal Service</u>, 8 F.3d 832, 837 (D.C. Cir. 1993).

[11] 29 U.S.C. § 158(a)(5).

mutual obligation to bargain collectively over "wages, hours, and other terms and conditions of employment."[12]  Subjects that fall within the statutory category of "wages, hours, and other terms and conditions of employment" are commonly referred to as "mandatory bargaining subjects."[13]  The United States Supreme Court has noted that, "[i]n general terms, the [category of mandatory bargaining subjects] includes only issues that settle an aspect of the relationship between the employer and employees."[14]  This general statement in turn highlights one last feature of a mandatory bargaining subject:  It must affect "employees."

With respect to this requirement, the Supreme Court noted with apparent approval the general definition of "employee" as "someone who works for another for hire," in holding that current retirees were not employees under the Act, because "retired employees have ceased to work for another for hire," and it would "utterly destroy the function of language to read [the Act's terms] as embracing those whose work has ceased with no expectation of return."[15]

---

[12] 29 U.S.C. § 158(d).

[13] See, e.g., Allied Chemical & Alkali Workers of America, Local Union No. 1 v. Pittsburgh Plate Glass Co., 404 U.S. 157, 176 (1971) (inquiring whether pensioners' benefits were "a mandatory subject of collective bargaining as 'terms and conditions of employment' of the active employees who remain in the unit"); NLRB v. Columbus Printing Pressmen & Assistants' Union No. 252, 543 F.2d 1161, 1164 (5th Cir. 1976).

[14] Allied Chemical, 404 U.S. at 178.

[15] Id. at 167-69, 172.

14

Synthesizing all of these observations, then, a refusal to bargain, or a unilateral change or modification, with respect to a mandatory bargaining subject constitutes an unfair labor practice.

As the D.C. Circuit noted, however, "'the duty to bargain under the [Act] does not prevent parties from negotiating contract terms that make it unnecessary to bargain over subsequent changes in terms or conditions of employment.'"[16] In addition, a party may, by means of a "clear and unmistakable" waiver, relinquish its statutory right to bargain.[17]

The Company advances two core reasons why it had no obligation to bargain over its announced prospective changes to the OPRBs. The first is that the OPRBs — and changes to them — were not mandatory bargaining subjects. In support of this point, the Company offers four affirmative defenses: (1) Future retirees are not "employees" under the Act, (2) the announced changes in life insurance benefits were not material, substantial, or significant; (3) the announced changes did not vitally affect a mandatory subject of bargaining for current employees; and (4) the announced changes did not have a tangible effect on a mandatory subject of bargaining.

The Company argues in the alternative that even if changes in

---

[16] B.P. Amoco Corp. v. NLRB, 217 F.3d 869, 872-73 (D.C. Cir. 2000) (quoting NLRB v. United States Postal Service, 8 F.3d 832, 836 (D.C. Cir. 1993)).

[17] See, e.g., Timken Roller Bearing Co. v. NLRB, 325 F.2d 746, 751 (6th Cir. 1963).

15

retirees' medical insurance are properly classified as mandatory bargaining subjects, the Unions expressly and unconditionally waived or relinquished their right to bargain over them.

We agree with the Board that the Company's announced unilateral changes affected mandatory bargaining subjects. We agree with the Company, however, that the Unions expressly and unconditionally waived their right to demand bargaining over changes in <u>medical</u> insurance benefits. Accordingly, we conclude that when the Company announced unilateral changes to future retirees' <u>life</u> insurance benefits — concerning which the Unions had not waived their right to bargain — the Company violated the Act and the Board's order must be enforced. As to the <u>medical</u> benefits, however, we conclude that the Company had the right to change those benefits unilaterally and that the Unions' express waiver of their right to demand bargaining shields the Company from liability: In announcing unilateral changes to medical benefits, the Company did not violate the Act, and we therefore set aside the Board's order insofar as it relates to medical benefits.

### 2. Changes Affecting Mandatory Bargaining Subjects

In defending its acts, the Company advances four reasons why its announced unilateral changes did not violate the Act: (1) Future retirees are not "employees" under the Act, (2) the announced changes in life insurance benefits were not material, substantial, or significant; (3) the announced changes did not vitally affect a mandatory subject of bargaining for current

16

employees; and (4) the announced changes did not have a tangible effect on a mandatory subject of bargaining. The Company's first defense seeks to limit the meaning of "employee" under the Act[18]; the remaining three seek to show that the changes did not reach or affect a mandatory bargaining subject, or, in the words of the Act, "wages, hours, and other terms and conditions of employment."[19]

As noted above, the Supreme Court has instructed us to accord special deference to the Board's interpretation of the Act: "Construing and applying the duty to bargain and the language of § 8(d), 'other terms and conditions of employment,' are tasks lying at the heart of the Board's function," so that "if [the Board's] construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute."[20]  Heeding this admonition, we turn now to the Company's four arguments.

The Company first asserts that the Board erred when it categorized the "future retirees" affected by the OPRB changes as "employees" under the Act, leading in turn to the erroneous conclusion that the OPRBs were mandatory bargaining subjects. The

---

[18] 29 U.S.C. § 152(3).

[19] 29 U.S.C. § 158(d).

[20] Ford Motor Co. v. NLRB, 441 U.S. 488, 497 (1979) (citing NLRB v. Iron Workers, 434 U.S. 335, 350 (1978) ("The Board's resolution of the conflicting claims in this case represents a defensible construction of the statute and is entitled to considerable deference.")).

17

Company appears to argue, in essence, that the Board has misinterpreted the seminal case on this issue, <u>Allied Chemical & Alkali Workers of America v. Pittsburgh Plate Glass Co.</u>[21] It is well settled, however, that <u>Pittsburgh Plate Glass</u> stands for the proposition that the retirement benefits of a company's <u>current</u> retirees are not mandatory bargaining subjects but that "<u>future</u> retirement benefits of active workers are part and parcel of their overall compensation and hence a well-established statutory subject of bargaining."[22] Even if there were merit to the Company's argument that <u>Pittsburgh Plate Glass</u> has been misconstrued and in fact establishes a distinction between non-vested retirement benefits and contractually enforceable ones, we would still conclude that the Board's interpretation of <u>Pittsburgh Plate Glass</u>, and the resulting construction of the statutory term "employee," is "reasonably defensible,"[23] at least as applied to materially adverse

---

[21] 404 U.S. 157 (1971).

[22] <u>Pittsburgh Plate Glass</u>, 404 U.S. at 180 (emphasis added).

[23] Neither is the instant case the only one in which the Board has determined that changes affecting future retirees constitute mandatory subjects of bargaining under the Act. <u>See, e.g.</u>, <u>Georgia Power Co.</u>, 325 NLRB 420, 420 (1998) ("[T]he prospectively announced changes in retirement benefits will affect currently active unit employees who will retire on or after the announced implementation date, and therefore were mandatory bargaining subjects."); <u>Midwest Power Systems, Inc.</u>, 323 NLRB 404, 406 (1997) ("The Supreme Court has clearly stated that the future retirement benefits of current active employees are a mandatory subject of collective bargaining under the Act. Unilateral modification of such benefits constitutes an unfair labor practice."); <u>Titmus Optical Co., Inc.</u>, 205 NLRB 974, 981 (1973) ("Changes in retirement benefits that affect current

18

changes in a subsisting retirement benefit.  Thus, this initial

challenge to the Board's ruling fails.

For its second defense, the Company contends that the life

insurance OPRB changes were not "material, substantial, and

significant," asserting in its appellate brief:

> Not one single member of the bargaining unit covered by
> the present Agreement is presently affected by this
> announcement.  Since there is neither a present injury to
> the individuals in the bargaining unit, nor an
> infringement on the Unions' right to bargain over this
> announcement of a future change when it becomes a present
> change, the Company's announcement did not give rise to
> a legally cognizable injury under § 8(a)(5).

Whether we construe the Company's objection as centering on the

prospective nature of the changes, or on the degree of the change,

it fails.  As we have already observed, retirement benefits,

although prospective, are considered part of an employee's

compensation package, and changes in the computation of such

benefits do constitute significant changes.[24]  Moreover, as the

Board points out, the changes that have been held not to be

"material, substantial, and significant," and therefore not

meriting protection under the Act, did not alter employees'

---

employees are a mandatory subject of collective bargaining, and a
unilateral modification of such benefits, during the term of an
agreement is in derogation of the bargaining obligation and
constitutes an unfair labor practice.").

[24] See Georgia Power Co., 325 NLRB 420, 420 n.5 (1998)
("[I]f a change involves the terms and condition of employment of
unit employees, it is a mandatory bargaining subject even if only
a relatively few employees are affected.").

entitlements or expectations at all.[25] Last, we remain mindful of our deference to the Board's construction of the Act, and echo the United States Supreme Court's response to a similar argument:

> As for the argument that in-plant food prices and services are too trivial to qualify as mandatory subjects, the Board has a contrary view, and we have no basis for rejecting it. It is also clear that the bargaining-unit employees in this case considered the matter far from trivial.... In any event, we accept the Board's view that in-plant food prices and service are conditions of employment and are subject to the duty to bargain.[26]

We therefore reject this second challenge to the Board's determination.

For its third defense, the Company argues that the announced prospective changes did not "vitally affect" a mandatory bargaining subject. This argument fails because the words, "vitally affect," hearken to a test that is inapplicable in this context. In Pittsburgh Plate Glass, the Supreme Court noted that, "[a]lthough normally matters involving <u>individuals outside the employment relationship</u> do not fall within [the mandatory bargaining subject]

---

[25] See, e.g., Civil Service Employees Ass'n, Inc., 311 NLRB 6, 7-8 (1993) (employees who were already required to remain in constant touch with the office were now required to carry beepers); Litton Microwave Cooking Products, 300 NLRB 324, 331-32 (1990), enforced, 949 F.2d 249 (8th Cir. 1991), cert. denied, 503 U.S. 985 (1992) (employer installed buzzers to signal the beginning and end of breaks, but did not alter the time allotted for breaks).

[26] Ford Motor Co. v. NLRB, 441 U.S. 488, 501 (1979).

category, they are not wholly excluded."[27]  The Court went on to describe cases in which the subject matter of negotiations between a company and a <u>non-employee third party</u> had an impact on the terms and conditions of the company's employees.[28]  The Court concluded that, when determining whether a company's <u>negotiations with a third party</u> were a mandatory bargaining subject, "the question is not whether the third-party concern is antagonistic to or compatible with the interests of the bargaining-unit employee, but whether it <u>vitally affects</u> the 'terms and conditions' of their employment."[29]

In <u>Keystone Steel & Wire v. NLRB</u>,[30] the D.C. Circuit reviewed the Board's attempt to apply the "vitally affects" test, and observed that "[t]he 'vitally affects' test is relevant...<u>only when a union seeks to bargain over a matter that would not normally be</u>

---

[27] <u>Pittsburgh Plate Glass</u>, 404 U.S. 157, 178 (1971) (emphasis added).

[28] <u>Id.</u> at 178-79 (1971) (emphasis added) (citing <u>Local 24, Inter. Teamsters, etc., Union v. Oliver</u>, 358 U.S. 283 (1959) (minimum rental that carriers would pay to truck owners who drove their own vehicles in carrier's service, in place of carrier's employees, was integral to the establishment of a stable wage structure for employee-drivers) and <u>Fibreboard Paper Products Corp. v. NLRB</u>, 379 U.S. 203 (1964) (company's contracting labor out to independent contractors is a statutory subject of collective bargaining).

[29] <u>Pittsburgh Plate Glass</u>, 404 U.S. at 179 (emphasis added).

[30] 41 F.3d 746 (D.C. Cir. 1994).

21

viewed as within the scope of mandatory bargaining."[31]  That is to say, when a company's negotiations with its own employees are at issue, the vitally affects test is inapplicable[32]; it only comes into play when some decision-making is at issue that does not at first glance appear to be within the scope of the mandatory bargaining provisions.  The only bargaining issue presented here is one directly between the Company and current employees, who are potential future retirees; the Company's assertion that the announced changes do not "vitally affect" current employees is simply wrong.

In its fourth and final defense, the Company contends that employers need only bargain over those changes that have a "tangible effect" on the employees' concerns.  The Board's answer to this argument is concise and on target:  Keystone Steel & Wire, from which the Company extracts the notion of a "tangible effect," is easily distinguishable from the instant case on two counts.  First, the unilateral changes at issue in Keystone Steel & Wire were to managements' retirement benefits only,[33] unlike the instant case in which the OPRB changes were to the employees' plans.

_____

[31] Id. at 753 (quoting U.S. Dept. of Navy v. FLRA, 952 F.2d 1434, 1440 (D.C. Cir. 1992)) (emphasis in original).

[32] See Georgia Power Co., 325 NLRB 420, 420 n.5 (1998) ("The Board rejected that same argument in Midwest Power Systems, finding the 'vitally affects' doctrine inapplicable to the situation of current employees with a direct interest in their future retirement benefits.").

[33] See Keystone Steel & Wire, 41 F.3d at 747-48.

22

Second, the Keystone Steel & Wire court considered the scope of the "effect" on employees' concerns in the course of its "vitally affects" analysis, which, again, is inapplicable to these facts.

To summarize, all four of the Company's defensive attempts to cast the OPRB changes as non-mandatory bargaining subjects fail. As we explain below, the Insurance Side Letter constituted a waiver by the Unions of their right to demand bargaining over medical insurance changes. With respect to life insurance, however, the Company can point to no document showing the Unions' waiver of their right to demand bargaining. Absent that, the Company is left without a viable defense to the Board's ruling that it has violated the Act. We must therefore defer to the Board's conclusion that the Company's announced unilateral changes to future retirees' life insurance benefits constituted a violation of the Act and, accordingly, enforce the Board's order insofar as it pertains to life insurance.

### 3. The Unions' Waiver

Our conclusion that the Company's announced unilateral changes to future retirees' insurance benefits affected a mandatory bargaining subject holds equally true for the changes to life and medical insurance benefits. It is in the context of the changes to medical insurance benefits, however, that the Company's alternative argument becomes relevant: Even if changes in retirees' medical insurance are properly classified as mandatory bargaining subjects,

23

the Unions expressly and unconditionally waived or relinquished their right to bargain over them. We agree with the Company that the Unions did waive and relinquish their right to demand bargaining over changes in medical insurance.[34]

To reiterate, the MOA does not mention insurance benefits of any kind, but the Insurance Side Letter contains the following language which imposes a "condition" on — more accurately, creates quid pro quo "consideration" for — the Company's agreement to contribute a set percentage or dollar amount to insurance premiums, including future increases:

> an agreement [by the Unions], as evidenced by the Union's [sic] acceptance, that [1] the matter of insurance coverage or [2] change in the Company's contribution toward the premium for insurance coverage of its employees shall not be subject to bargaining or a request for bargaining by the Union until the expiration of the Memorandum of Agreement, except by mutual consent. [Enumeration ours.]

When the ALJ reviewed this clause, he stated,

> As to the zipper clause,[35] the language in that

---

[34] In addition to the arguments discussed above, the Company also advanced another, grounded in its rights under ERISA to alter the Medical Benefits Plan at will. Because we conclude that the Unions waived their right to demand bargaining when they signed the Insurance Side Letter, we need not consider the Company's ERISA-based argument.

[35] Although the ALJ termed this provision of the Insurance Side Letter a "zipper clause," and the parties have continued to refer to it as such in their briefs and arguments, we note that this clause, which specifically prevents bargaining over particular topics, is quite unlike the typical zipper clause examined in the case law. Typically, after a CBA has been negotiated and agreed on by the parties, a zipper clause is

24

clause appears to preclude Respondent from unilaterally changing the OPRB. At most the language is ambiguous. The Board has consistently refused to find waiver by unions

---

inserted to "zip up" the agreement. As one ALJ explained, zipper clauses

are often inserted in labor contracts to make sure that there is nothing dangling and that, during the contract term, one party cannot force the other back to the bargaining table to discuss items that they forgot to discuss or which they deliberately avoided during negotiations but which fall within the broad definition of "wages, hours, and terms and conditions of employment."

Mary Thompson Hospital, 296 NLRB 1245, 1249 (1989). The stereotypical zipper clause provides:

The parties acknowledge that during the negotiations which resulted in this Agreement, each had the unlimited right and opportunity to make demands and proposals with respect to any subject or matter not removed by law from the area of collective bargaining, and that the understanding and agreements arrived at by the parties after the exercise of that right and opportunity are set forth in this agreement. Therefore, the Company and the Union, for the life of this Agreement, each voluntarily and unqualifiedly waives the right, and each agrees that the other shall not be obligated to bargain collectively with respect to any subject or matter referred to, or covered in this Agreement, or with respect to any subject or matter not specifically referred to or covered by this Agreement even though such subject or matter may not have been within the knowledge or contemplation of either or both of the parties at the time they negotiated or signed this Agreement.

GTE Automatic Electic Incorporated, 261 NLRB 1491, 1491 (1982). When such a zipper clause is at issue, it is easy to see why one might question whether the unions had granted a clear and unmistakable waiver of the right to bargain over a specific matter not covered in the CBA. Here, in stark contrast, we are not left to wonder whether the union representatives might have failed to think about medical insurance when they penned their signatures. Much of the case law analyzing the unions' waiver by means of a typical zipper clause is therefore inapposite, for this is no typical zipper clause, despite the parties' calling it one.

25

in situations similar to the instant one.[36]

The Board, in its review of the ALJ's ruling, disagreed with his

approach, and explained its preferred analysis:

> Finding, in effect, that the zipper clause applied to the OPRB changes at issue here, the [ALJ] found that "the language in the zipper clause appears to preclude Respondent from unilaterally changing OPRB. At most it is ambiguous." Accordingly, the judge found that the zipper clause did not establish that, as the Respondent contended, the Locals had waived their right to bargain over the OPRB changes.
>
> Contrary to the judge, we find that the zipper clause does not apply to the OPRB changes at issue here and, on this basis, find that the zipper clause does not evidence the Locals' waiver of their right to bargain over the OPRB changes. The zipper clause, by its terms, contains an offer by the Respondent and an acceptance by the Locals that covers the employees' medical premiums "during the term of the resulting [Insurance Side Letter] agreement." The announced OPRB changes, however, are for changes that will not occur until January 1, 2002, a date outside the term of the side-letter agreement. Therefore, the announced OPRB changes are not in any way addressed by the zipper clause. Since the announced OPRB changes will fall outside the term of the side-letter agreement, the zipper clause contained in the side-letter agreement cannot constitute a clear waiver of the Locals' right to bargain over those changes. Therefore, the zipper clause does not permit the Respondent to make the OPRB changes at issue here without bargaining with the Locals.[37]

---

[36] Mississippi Power, 332 NLRB No. 52 (2000), 2000 WL 1504672, at *11 (citing Exxon Research & Engineering Co., 317 NLRB 675 (1995); T.T.P. Corp., 190 NLRB 240, 244 (1971)).

[37] Id. at *4.

26

Thus the Board construed the Insurance Side Letter in such a way that its "term" — which is coextensive with the term of the MOA, comprises both the initial three-year term and all annual renewals, which clearly could have (and, for all we know, might have) prolonged the term of the MOA, and thus the Insurance Side Letter, beyond January 1, 2002 — defines not only the time during which bargaining is foreclosed on the enumerated topics, but also the time during which the Company's unilateral changes must take effect if the Unions' relinquishment of bargaining rights is to apply.

Nothing in the language of the Insurance Side Letter supports the Board's construction. As a temporal element, the term of the Insurance Side Letter addresses two things, and two things only: It states first that "during the term of the resulting agreement [the Company] will continue to pay seventy percent of the cost of group medical insurance coverage...," and second, that, as we have emphasized, the "matter[s] of insurance coverage or change in the Company's contribution toward the premium" will not be subject to bargaining or a request for bargaining by the Unions "until the expiration of the [MOA]." (Emphasis added.) Plainly, the Company's contribution commitment, on the one hand, and the Unions' relinquishment of any right to insist on bargaining for (1) increases in the Company's contributions and (2) unilateral coverage changes by the Company, on the other hand, are the only matters that are cabined within the term of the Insurance Side Letter. The Board impermissibly stretches the language of the

27

Insurance Side Letter to construe the express term of the agreement as containing not only a temporal moratorium on bargaining, but also a temporal limit on the <u>effective date</u> of the changes over which bargaining is foreclosed. Yet the date on which any Company-declared change is to take effect is simply irrelevant. The Board misconstrued the contract when, from the whole cloth, it created a an effective-date temporal element in the Insurance Side Letter. If allowed to stand, such an interpretation would produce the anomalous result of telling the Company, "If you want to make a change in coverage that negatively affects employees who are union members, you must make such changes effective now (<u>i.e.</u>, start the pain immediately) rather than postponing it for seven years."

Differing with the Board's contractual interpretation, we hold that the Unions expressly, clearly and unmistakably waived bargaining on the changes in the Medical Benefits Plan that are here at issue. In essence, the Unions agreed that the Company could modify coverage or terminate that plan altogether, but neither expressly nor implicitly limited that concession to modifications or terminations with current effective dates. Rather, the Company was free to <u>make such changes effective as of any time during the continued existence of this particular CBA</u> which, through a series of automatic renewals, could extend past January 1, 2002.[38]

---

[38] Again, the question is not before us, but the converse of this proposition is that if the CBA should terminate before the

28

We are aware, as the Board reminds us, that as a general rule, appellate courts are constrained to give considerable deference to the Board's determinations on the issue of waiver. Our disapproval of the Board's waiver determination here is premised, however, on basic principles of labor contract construction, over which we conduct de novo review[39] and with respect to which we need accord no deference to the Board's determination.[40] In reaching a conclusion different from the Board's with respect to waiver, we get there by correcting the Board's misconstruction of the plain language of these labor contracts, which is our special prerogative, not the Board's.

---

prospective effective date of the changes, then perforce, they would be of no effect unless incorporated in the successor CBA or group medical insurance plan, or both.

[39] BP Amoco Corp. v NLRB, 217 F.3d 869, 873 (D.C. Cir. 2000) ("Because the courts are charged with developing a uniform federal law of labor contracts under section 301 of the Labor Management Relations Act...., we accord no deference to the Board's interpretation of labor contracts.") (quoting NLRB v. United States Postal Service, 8 F.3d 832, 836 (D.C. Cir. 1993)); United States Postal Service, 8 F.3d at 837 ("In a case such as this one,...the resolution of the refusal to bargain charge rests on an interpretation of the contract at issue.... Normally, under federal labor laws, arbitrators and the courts, rather than the Board, are the primary sources of contract interpretation."). We acknowledge, of course, that our review is for clear error only when a contract is ambiguous, because such review implicates questions of fact. Determination of whether a contract is ambiguous is a question of law, however, which we review de novo. Likewise, interpretations of unambiguous contracts, such as the one presently before us, also present questions of law, subject to de novo review. See Stinnett v. Colorado Interstate Gas Co., 227 F.3d 247, 254 (5th Cir. 2000).

[40] BP Amoco, 217 F.3d at 873.

29

Neither does our construction require an impermissibly "expansive" reading of the contracts, which is how the Board classified the Company's like reading. None disputes that the parties reached the Insurance Side Letter agreement following negotiations, so that any argument suggesting that the Unions' waiver of a statutory bargaining right was unwitting is foreclosed by the facts. Neither do we need to infer any terms to reach our conclusion; rather, we simply correct the Board's own erroneous inference of provisions (the limit mistakenly imposed on the effective date of changes about which bargaining was foreclosed) and rely on the clear and unambiguous language of the contract, which uses the co-extensive time spans of the MOA and the Insurance Side Letter to define only the term of (1) the Company's agreement to maintain the level of premium contribution while health insurance coverage continues, and (2) the Unions' surrender of any bargaining right over premiums and coverage. We discern nothing in the agreements, either explicit or implicit, about when otherwise permissible Company changes can or cannot take effect.

The thrust of our conclusion that the "condition" in the Insurance Side Letter constituted a waiver should be obvious: The right to bargain over the "matter of insurance" was the right explicitly relinquished by the Unions when they signed the Insurance Side Letter in exchange for a guaranteed level of premium contributions from the Company for as long as the MOA and Company-sponsored group medical insurance continued in existence. When

30

viewed in the light of the pellucid language of the Insurance Side Letter, therefore, the Unions' "request for bargaining" over the changes in retirees' medical insurance benefits —— indisputably a "matter of insurance" —— before "the expiration of the [MOA]," flies in the face of the parties' express agreement. As a result, the Company was justified in refusing to heed the Unions' request to bargain over those prospective OPRB changes affecting health insurance, declared by the Company during the term of the Insurance Side Letter and the MOA.

Of course, the Insurance Side Letter did give the Unions an alternative course of action which they did not take. Like the MOA, the Insurance Side Letter, states that "[t]he party desiring to change or terminate the agreement after the expiration of the [MOA], must notify the other party in writing at least sixty (60) days prior to August 16 of the year in which such termination or changes are desired, stating in the notice the nature of the changes desired." The Company announced the prospective OPRB changes on April 21, 1995, and the then-current term of the MOA was scheduled to expire on August 16, 1995. Nothing prevented the Unions from notifying the Company, in writing, by or before June 15, 1995 —— or, for that matter, June 15 of any subsequent plan year before the one commencing August 16, 2001 —— of their desire not to have the MOA and the Insurance Side Letter agreement renew automatically. But the Unions cannot have it both ways: They cannot allow the MOA —— and thus the Insurance Side Letter

31

Agreement — to continue being extended from each August 16 to the next and, at the same time, seek to bargain about that which they have waived the right to bargain over for the duration of those agreements.

4. The Company's Unilateral Change of Retirees' Medical Benefits

The Board advances that even if, through the Insurance Side Letter, the Unions did waive their right to bargain, that waiver did not give the Company carte blanche to make unilateral changes to future retirees' medical benefits.  In its brief, the Board argues:

> Accordingly, even if the Company were correct in asserting that the zipper clause precluded a union request to bargain over medical insurance matters, the zipper clause also would, as a threshold matter, have precluded the Company from unilaterally altering the terms of medical insurance in the first place.

Not only does this non-sequitur voice flawed logic, it is directly contradicted by the clear wording of that agreement.

We acknowledge that a waiver of bargaining must be clear and unmistakable before it can be used to defend against an unfair labor practice charge of refusing to bargain; and, too, we are aware that there must be ample evidence showing that the waiver actually covers the matter at issue.  Here, there is express waiver, clearly and unmistakably articulating that the identified topics — coverage and premiums on medical insurance — "shall not

32

be subject to bargaining or a request for bargaining by the Union." Moreover, the agreement in which the waiver is found is titled "Group Medical Insurance Agreement," and the waiver expressly precludes bargaining on the "matter of insurance." This supports incontrovertibly the factual determination that the specific topic at issue (the Company's future contributions to medical insurance benefits of future retirees and the extent and existence of their coverage) is within the topic covered by the instant waiver.

That there has been a waiver, and that the waiver covers the contested matter, must therefore be accepted. It is the <u>effect</u> of the waiver that the Board would put at issue in its alternative argument. The Board appears to perceive that the only effect a waiver can have is to remove the Unions' right affirmatively to propose changes to medical insurance. That is only one side of the coin, however; the other, inseparable side of that same coin is the employer's right to make unilateral changes without being obligated to bargain with the Unions first. In its review of the ALJ's ruling in the instant case, the Board betrayed its own understanding that these would be concomitant results of a finding of waiver:

> Since the announced OPRB changes will fall outside the term of the side-letter agreement, the zipper clause contained in the side-letter agreement cannot constitute a clear waiver of the Locals' <u>right to bargain</u> over those changes. Therefore, the zipper clause does not permit the Respondent <u>to make the OPRB changes at issue here without</u>

33

<u>bargaining</u> with the Locals.[41]

The unspoken assumption, of course, is that if the Board <u>had</u> found waiver, it, too, would have concluded that the Company was free "to make the OPRB changes at issue here without bargaining with the Locals." Similarly, <u>Pepsi-Cola Distributing Co.</u>, a case on which the Board relies, repeatedly bespeaks the understanding that a party, through waiver, relinquishes "the right to be consulted concerning unilateral changes."[42] Thus, we understand that once a clear and unmistakable waiver concerning the matter at issue is found, the effect of that waiver is not only to foreclose the Unions' right to request changes and demand bargaining, but also to eschew any obligation of the employer to bargain before making unilateral changes of the kind reserved.

This conclusion is further supported by the facts of the instant case, in which the unilateral change at issue was made with respect to a benefit that the Company furnishes gratuitously and which, by its own terms (and consistent with ERISA), never vests. As emphasized at the outset of this opinion, the Medical Benefits Plan expressly provides that neither employees' nor retirees' medical benefits ever vest and that the Company reserves the right unilaterally to amend coverage or terminate it altogether. This comports with ERISA's provision that exempts employee welfare

---

[41] <u>Mississippi Power Co.</u>, 332 NLRB No. 52 (2000), 2000 WL 1504672, at *4 (emphasis added).

[42] 241 NLRB 869, 869 (1979).

34

benefit plans from that law's vesting requirements.[43]  Thus, if anything were to obligate the Company to continue the retirees' medical insurance coverage or to maintain the type or terms of the coverage (thereby negating the Company's unilateral power to do so despite the express reservation in the Medical Benefits Plan itself), it would have to be found in some other document.

The MOA, as we have noted, does not mention medical benefits at all and therefore cannot conceivably be the source of any countervailing obligation on the Company's part not to change medical insurance benefits unilaterally.  That leaves the Insurance Side Letter as the only possible source of such a countervailing Company obligation.  The Insurance Side Letter, however, locks the Company into only one obligation with respect to group medical insurance:  the level of the Company's contribution to premiums incurred during the term of the Side Letter Agreement.  Therefore, by deductive reasoning (<u>inclusio unus est exclusio alterius</u>), all other aspects of the Medical Plan — from the furnishing of medical insurance <u>vel</u> <u>non</u> to the adjustment of discrete terms of the selected insurance plan — remain subject to the Company's unfettered, unilateral control.  In sum, under the Medical Benefits Plan, the Company had the right to make the changes to retirees' medical insurance benefits unilaterally and to make them effective on any current or future date that it chose; and no other document,

---

[43] <u>See</u> 29 U.S.C. § 1051(1).

including the Insurance Side Letter, diminished or otherwise affected this right.

Despite such reasoning, which gives effect to the reservation of rights language in the Medical Benefits Plan, the Board has taken the position that this clause should not be read to validate the Company's unilateral changes because the Unions did not accede to those provisions, the Medical Benefits Plan having been "unilaterally promulgated" by the Company. In support of this contention, the Board asserts that the Medical Benefits Plan would need to have been incorporated into the MOA, such that the parties clearly bargained with respect to it, before the reservation of rights clauses could be given effect. Not only is this sort of reasoning unsound, it is at least arguable that when the Medical Benefits Plan was adopted by the Company it was indeed incorporated into the MOA <u>ipso</u> <u>facto</u> by the provisions of the pre-existing Insurance Side Letter. More to the point, we find internally inconsistent the Board's statement that the medical insurance benefits are mandatory subjects of bargaining but that the Unions are free to disregard some of the express terms of the very document that grants and defines those very benefits.

First, it is quite conceivable that the Insurance Side Letter served to incorporate the Medical Benefits Plan into the MOA. The Board asserts, citing <u>Jeniso v. Ozark Airlines, Inc. Retirement</u>

36

<u>Plan for Agent and Clerical Employees</u>,[44] that a "mere mentioning" of medical insurance does not suffice to incorporate a medical benefits plan. We do not dispute this proposition; we do take serious exception, however, with the Board's characterization of the Insurance Side Letter, which (1) addresses only medical insurance matters, (2) results in an agreement entitled "Group Medical Insurance Agreement," and (3) is physically appended to and printed with the MOA, as a "mere mentioning" of medical insurance. Any objective reading of that contract refutes such trivializing.

Additionally, the Board's assertion that the Insurance Side Letter "fails even to mention the [Medical Benefits] Plan" is, on these facts, scant support for the Board's further argument against incorporation — that "there is no evidence that the Unions have voluntarily 'exercised their bargaining right.'"[45] First, except in the most hypertechnical sense, that statement is just plain wrong: The Insurance Side Letter contains the words "Group Medical Insurance Agreement" in boldface print immediately before the signatures of the Unions' representatives. Moreover, it unduly stretches credence to imagine that in the course of bargaining over the Company's contribution to medical insurance premiums, the Unions were somehow precluded from bargaining over the matter of medical insurance generally. Regardless of whether they might have

---

[44] 187 F.3d 970, 973 (8th Cir. 1999).

[45] Respondent's Brief at 36, citing <u>Department of Navy v. FLRA</u>, 962 F.2d 48, 57 (D.C. Cir. 1992).

succeeded, the Unions could have sought —— bargained for —— a commitment from the Company not to terminate or amend the then-current or any future medical benefits during the term of the MOA, thereby limiting the unilateral reservation of rights clauses. That they failed to do so or were unsuccessful, as the case may be, does not mean that the Insurance Side Letter (which deals only with medical insurance benefits) did not incorporate generically the then-present and all future medical insurance plans that define the scope of those benefits. Finally, the Insurance Side Letter could not possibly have referred to the Medical Benefits Plan by name: As the Board knows only too well, that particular plan did not even go into effect until March 1, 1993, the calendar year following the one in which the MOA and Insurance Side Letter were formed. In sum, because medical benefits were substantially more than "merely mentioned" in the Insurance Side Letter, and because the Medical Benefits Plan defines those benefits, it is only logical to conclude that the Company's medical insurance plan was incorporated by reference into the MOA by the Insurance Side Letter.

But even if the Medical Benefits Plan were not incorporated by reference, we cannot disregard the fact that the Board premises its entire unfair labor practice charge, as it must, on the contention that future retirees' medical insurance benefits are a mandatory subject of bargaining because they fall within the category of "wages, hours, and other terms and conditions of employment." As our earlier general discussion of OPRB changes demonstrates, we

38

accept this proposition.[46] If medical insurance benefits are mandatory subjects of bargaining, however, these terms and conditions of employment must be defined by the Medical Benefits Plan, the only document that describes them; and it is none other than the Medical Benefits Plan that gives the Company the power unilaterally to amend or terminate the benefits specified in it.[47] It is irreconcilably inconsistent to argue that medical insurance benefits, which are identified and delimited solely by the Medical Benefits Plan, are a mandatory bargaining subject when such an argument suits the Unions or the Board, but to insist that specific provisions of the document defining these very benefits need not be enforced when the Company is the one attempting to do so. The

---

[46] See also W.W. Cross & Co., Inc., 174 F.2d 875, 878 (1st Cir. 1949) (establishing that "the word 'wages' in...the Act embraces within its meaning direct and immediate economic benefits flowing from the employment relationship[, and] covers a group insurance program"); Shane Felter Industries, 314 NLRB 339, 346 (asserting that "[a] health insurance plan is a benefit constituting a term and condition of employment whether established pursuant to a collective-bargaining agreement or not").

[47] As noted above, see supra note 4, we do not mean to suggest that, absent the Insurance Side Letter, the Unions would not have had the right to seek to bargain over any unilateral changes in medical benefits made by the Company pursuant to the provisions in the Medical Benefits Plan. We only emphasize that the Medical Benefits Plan describes all of the attributes of the "term of condition of employment" of medical benefits. Having waived the right to seek to bargain over the "matter of insurance," in the Insurance Side Letter, the Unions may not pick and choose which attributes of the medical benefits their waiver reaches.

dissent in T.T.P. Corp.[48] addressed this incongruity succinctly:

> The Trial Examiner correctly found that the Retirement Income Plan was not physically part of the collective-bargaining agreement[, and] further stated that, "The Plan had been in existence for years and had become an integral part of the existing conditions of employment on which the employees had a right to rely." The Respondent convincingly argues, however, that it is impossible legally to justify the Trial Examiner's reasoning that, on one hand, the clauses of the Plan providing benefits for employees are a vested and expected right governed by those provisions in the Plan, while on the other hand disavowing the "troublesome" termination clause found in article IX which is as much a part of the Plan as are any of the benefit clauses.[49]

We too reject the Board's attempt to "cherry pick" the particular provisions of the Medical Benefits Plan, choosing to advert to those that work for it while ignoring those that do not, as evidenced by the Board's effort to cast medical insurance benefits as mandatory subjects of bargaining, on the one hand, while denying, on the other hand, that the Unions had acquiesced in the Company's reservation of rights clauses in the selfsame, gratuitously-offered Plan.

To summarize, then, our response to the Board's assertion that any waiver by the Unions of their right to bargain over the "matter of insurance" did not give the Company free rein to make prospectively effective unilateral changes in future retirees'

---

[48] 190 NLRB 240 (1971).

[49] Id. at 241 (Chairman Miller, dissenting) (emphasis added).

medical benefits is this: It is accepted, even by the Board itself, that there are two concomitant effects of waiver. One effect is that the Unions relinquish their right to demand bargaining on premium contributions and coverage changes by the Company, which are the express subjects of the waiver. The second effect of waiver is that the Company can make unilateral changes (other than reducing its premium contributions) relating to those subjects without any obligation to bargain with the Unions before making them. Next, the Company had the right to make the unilateral changes at issue because such changes affect benefits furnished gratuitously by the Company under a plan that is subject to no limitations except those spelled out in the Insurance Side Letter, and then only as to the level of the Company's contribution to premiums. And last, in answer to any contention that the Unions must have acceded to the reservation of rights language in the Medical Insurance Plan before that reservation could be given effect, we answer first that it is entirely possible that the Insurance Side Letter incorporated the Medical Benefits Plan (including its reservation of rights clause) into the MOA, and second, that the Board, which argues so strenuously in favor of these benefits being mandatory bargaining subjects, is poorly positioned to take issue with particular provisions of the Medical Benefits Plan that define these very benefits.

## III. Conclusion

The Company's challenge to the Board's order, insofar as it

41

pertains to announced unilateral changes to future retirees' life insurance benefits, fails. The Board's determination that future retirees' life insurance benefits constitute a mandatory subject of bargaining is a reasonably defensible construction of the Act, and the Company can point to no defenses, contractual or otherwise, for its violation of the Act. The Company's petition with respect to life insurance benefits is therefore denied, and enforcement of the Board's order, insofar as it pertains to life insurance, is granted.

As for medical insurance coverage, however, the Unions expressly and unambiguously waived their right to bargain over any changes. That waiver by its nature includes (or, at least fails to exclude) prospective changes to medical insurance benefits of future retirees, including at least potentially some currently active employees of the Company. As the Company was thus justified in refusing to bargain over the matter, the Company's petition with respect to medical insurance benefits is granted, that portion of the Board's order is set aside, enforcement of the Board's order insofar as it pertains to medical insurance is denied, and the case is remanded to the Board for entry of appropriate orders consistent with this portion of our opinion.

PETITION GRANTED IN PART AND DENIED IN PART; CROSS-PETITION DENIED IN PART AND GRANTED IN PART; ORDER PARTIALLY SET ASIDE; and CASE REMANDED with instructions.