KENNAMETAL, INC., Plaintiff,

v.

UNITED STEELWORKERS OF
AMERICA, AFL–CIO, et
al., Defendants.

No. 1:02CV00175.

United States District Court,
W.D. Virginia,
Abingdon Division.

May 23, 2003.

Charles P. Roberts, III, Constangy, Brooks & Smith, LLC, Winston–Salem, North Carolina, for Plaintiff.

James J. Vergara, Jr., Vergara & Associates, Hopewell, Virginia, for Defendants.

## OPINION

JONES, District Judge.

In this labor arbitration case the employer contends that the arbitrator's award was flawed because the arbitrator refused to consider the terms of a benefit plan incorporated in the collective bargaining agreement on the ground that the union did not receive a copy of the benefit plan before the agreement was ratified by the union membership. I agree with the employer and will remand the case for another arbitration.

I

This action was brought by Kennametal, Inc. (hereafter "Kennametal" or "the Company") pursuant to section 301 of the Labor Management Relations Act of 1947, 29 U.S.C.A. § 185 (West 1998), seeking to vacate an arbitrator's award following arbitration of a labor dispute between Kennametal and the union representing its employees at Kennametal's Chilhowie, Virginia, plant. The defendants, United Steelworkers of America, AFL–CIO/CLC, and United Steelworkers of America, Local 15094–2 (hereafter collectively "the Union"), are unincorporated labor unions. The Union filed a counterclaim seeking to enforce the arbitration award and both sides have filed motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. The motions have been briefed and argued and are ripe for decision.

The facts as disclosed by the summary judgment record are as follows.

For a number of years the American Mine Tool Division of Rogers Tool Works, Inc. ("AMT") operated a manufacturing facility located in Chilhowie, Virginia, and the Union represented the production and maintenance employees there for collective bargaining purposes. The Union and AMT were parties to a collective bargaining agreement ("CBA"), periodically renewed, the last of which was effective from May 27, 1996, through June 25, 2000. This 1996–2000 CBA included provisions providing insurance benefits at certain specified costs to employees and providing a 401(k) plan with certain specified contribution matching by the employer.

Kennametal is a multinational corporation, headquartered in Latrobe, Pennsylvania, with numerous employees worldwide. In October 1997, Kennametal acquired the parent company of AMT, and the Chilhowie facility became an operating unit of Kennametal. Following its acquisition of the Chilhowie facility, Kennametal continued to recognize the Union as the exclusive bargaining representative for the Chilhowie production and maintenance employees.

The benefit plans that Kennametal provided to employees who were not represented by a union were different from the benefit plans available to the Chilhowie

employees under the 1996–2000 AMT contract. The Kennametal benefit plans included a plan known as "Flex ... the Choice is Yours," also referred to as the Flex Plan, which covered various employee benefits such as medical, dental, disability and life insurance programs. The Kennametal Thrift Plan ("the Thrift Plan") was in essence a 401(k) plan,[1] but it was less favorable to the Chilhowie employees than their existing 401(k) plan because it did not require any minimum contribution by the Company and like the Flex Plan, it was subject to modification and amendment from time to time. The Kennametal Inc. Retirement Income Plan ("Retirement Plan") was a plan for which the Chilhowie employees had no counterpart. The Retirement Plan was a defined benefit pension plan fully funded by Kennametal.

In the early part of 1998, Kennametal came to the conclusion that it needed certain changes in the then-existing Chilhowie CBA. Specifically, the Company wanted greater flexibility in the type of work that could be assigned to employees, greater flexibility in the facility to which work could be assigned, and changes in employees' jobs. Knowing that the Union would not agree to such mid-term changes without receiving something in return, the Company decided to offer the Union the Kennametal benefit plans as a package in return for the flexibility changes desired by the Company. It was the belief of John Jamison, a labor relations manager for Kennametal, that the Union might agree to the changes that the Company wanted in order to obtain the Kennametal benefit plans, particularly the Retirement Plan.

Once the Company had decided to seek a reopening of the existing Chilhowie CBA, Jamison contacted Guy Hartless, who was the Union's international representative with responsibility for the Chilhowie facility. On May 26 and 27, 1998, Jamison and other Company representatives met with Hartless and the Union committee to discuss the Company's proposal. The Company also claims that on May 29, 1998, its manager of corporate benefits met with Jeannette Stump, a Union benefits specialist, in the Union's offices in Pittsburgh, and gave her copies of all of the Kennametal benefit plans to review.

The Union subsequently conducted a vote of its members to determine whether to reopen the contract for negotiations. After the vote, the Company was advised that the employees had voted not to reopen at that time. Jamison later asked Hartless what had happened, and Hartless replied that the employees were provided too much information too fast and that he perceived that there was no chance of a deal without something being proposed on wages.

After the Company's efforts to reopen the existing agreement failed in June, the Company decided to let some time pass, but to revisit the issue later in the year with a complete package proposal. In late August, the Company and the Union held preliminary discussions about negotiating a new agreement, and the parties agreed to meet on September 15, 1998.

On that day Jamison and the Company committee met with Hartless and the Un-

---

1. A 401(k) plan allows an employee to make before tax contributions to a tax deferred retirement investment account. An estimated 52 million employees in the United States have 401(k) plans, which many depend on for their retirement. *See* Ruth Simon, *Why Even a Rally Won't Save You*, Wall St. J., May 1, 2003, at D1. Frequently employers make matching contributions to 401(k) plans, although a number of major companies, including Goodrich, Textron, Goodyear, and Ford Motor Company, have recently reduced or suspended their matching contributions. *See id.*

ion committee, and the Company explained its proposal. In a written proposal, Jamison advised the Union that, among other things, the Company was "prepared to offer the savings, company match and investment benefits of the Kennametal Thrift Plan" in return for Union concessions as to job flexibility. At the time, the Company matched employee contributions to the Thrift Plan fifty cents on the dollar up to six percent of the employee's eligible annual compensation.

The Company and the Union met to negotiate on September 23, October 20, October 21, and October 22, 1998. The Company claims that during these negotiations, a copy of each of the Kennametal benefit plans was given to Hartless. The Union proposed to accept the Flex Plan and the Retirement Plan, but to keep the existing Chilhowie 401(k) plan. The Company rejected this proposal. The Union committee expressed concern about what future changes might occur in the Kennametal plans. Members of the committee made comments such as, "This is what it is today, but what will it be tomorrow?" and "But this could change." The Company's response to these comments was that the Chilhowie employees would be treated in a manner identical to other Kennametal employees who already were participants in these plans.

During these negotiations the parties also discussed certain language changes in the agreement that would need to be made to reflect the new benefit plans. It was agreed that the existing language concerning benefits would be removed and replaced by language incorporating the Kennametal benefit plans into the new CBA by the following language:

19.1 A benefit program, "Flex ... the Choice is Yours," is part of the "Agreement" and will be extended to all eligible employees in the bargaining unit. This benefit will supersede all other related benefits in place effective January 1, 1999.

. . . .

20.1 The pension program, "Kennametal Inc. Retirement Income Plan," is part of the "Agreement" and will be extended to all eligible employees in the bargaining unit. Participation in the pension program will be effective January 1, 1999.

20.2 The retirement savings program, "Kennametal Thrift Plan," is part of the "Agreement" and will be extended to all eligible employees in the bargaining unit. Participation in the retirement savings program will be effective January 1, 1999.

As pertinent to the present controversy, in Article 11.010 of the Thrift Plan the Company "reserves the right ... to amend, modify, suspend or terminate the Plan." Under Article 11.020 of the Thrift Plan the Company may "discontinue its contributions under the Plan for any reason at any time."

In addition, Article 17.6 of the 1996–2000 CBA was adopted verbatim into the new CBA. That provision, which is central to this case, provided as follows:

Matters relating to the Company's Group Insurance Plans, Retirement Plan, and all other employee benefit programs shall be subject to the grievance or arbitration procedure on benefit levels only. Matters pertaining to benefits administration such as claim processing or payment, selection of insurance carriers or administrators, eligibility for coverage, etc., will not be subject to the grievance or arbitration procedures. The parties agree to meet prior to any proposed benefit change to discuss the change. The Company agrees to ensure that any change will result in a benefit that provides a comparable benefit structure to the benefit being replaced.

On October 29, 1998, the Union's members at Chilhowie ratified the new CBA. On that day authorized representatives of the Company and the Union signed a "Memorandum of Settlement" adopting the new CBA, to be effective from November 2, 1998, to June 25, 2003. Hartless requested that Jamison provide him with multiple copies of the Thrift Plan and the Retirement Plan for the Union's files. By letter dated November 13, 1998, Jamison sent Hartless copies of these plans.

Thereafter the Company made several changes to the Thrift Plan that affected all participants. Among other things, the Company required that as of October 1, 1999, all matching cash contributions by the Company be made in Kennametal stock, rather than whatever investment options the participating employee had selected.

The Company also made changes in the Flex Plan each year. Substantial increases occurred annually in the premium contributions that employees had to make for various medical plan options. Moreover, the Company revised the definition of eligibility for coverage so as to preclude an employee from covering a spouse who was also an employee as a dependent. There were approximately ten employees at the Chilhowie facility who were affected by this change.

The Union never complained that the Company lacked the authority to make the above described changes to the Kennametal benefit plans. However, effective January 1, 2002, the Company amended the Thrift Plan to provide for a discontinuation of the Company's matching contributions. On January 14, 2002, the Union filed a grievance on behalf of all Chilhowie bargaining unit employees asserting that the Company had unilaterally changed the Thrift Plan. The grievance was processed through the procedures established in the CBA, but the Company and the Union failed to reach any agreement or resolution. The Union then requested arbitration. The Company and the Union eventually selected Nathan Lipson as the arbitrator to decide the dispute and Lipson conducted a hearing on the grievance on July 24, 2002.

The Company's position in arbitration was that it understood and interpreted the CBA as requiring arbitration on benefit matters only if the Company implemented something other than the expressly incorporated Kennametal benefit plans or took some action regarding benefits that was outside the scope of the Kennametal plans. Thus, if the Company were to replace the Thrift Plan or some other Kennametal benefit plan with a new plan, the Union could allege a change in benefit levels and the matter would be arbitrable. On the other hand, the Union would not be able to arbitrate actions of the Company in conformance with the terms of the Kennametal plans as such actions did not affect benefit levels. According to the Company, it was never its understanding that the Union would be able to arbitrate decisions made by the Company under the terms of the Kennametal plans because these plans affect thousands of employees, most of whom are not represented by a union, and the Company did not want decisions affecting all participants to be subject to arbitral challenge in a few represented units.

The Company also argued that it had made significant changes to the benefit plans every year since 1999 and at no point did the Union ever challenge the Company's right to make any of these changes, even though many of them were unfavorable to employees.

On August 26, 2002, Arbitrator Lipson issued his Opinion and Award. He found that the Company had violated the CBA when it suspended matching contributions to the Thrift Plan by not meeting with

the Union prior thereto and offering a substitute benefit, as required by Article 17.6 of the CBA. The arbitrator determined that the Thrift Plan document had been delivered to the Union only after the ratification of the new CBA and that the provisions of the Thrift Plan allowing the Company to suspend matching contributions had not been "verbally imparted" to the Union prior to the ratification. Accordingly, the arbitrator held that the Union had not agreed to those provisions of the Thrift Plan and was not bound by them. The Company was directed to reinstate the matching contributions retroactively to January 1, 2002. The Company refused and this action followed.[2]

## II

The first issue presented is whether the contract dispute is subject to arbitration. Did the parties agree to arbitrate the question of whether the Company had the authority to unilaterally abolish its match of employee contributions to the Thrift Plan? If not, then the arbitration award ought to be set aside.[3] The Company argues that it did not agree, because Article 17.6 of the CBA removes such an issue from the grievance and arbitration procedure. The Union disputes such an interpretation of the language of 17.6 and in addition argues that the Company by its conduct consented to arbitration of the issue and waived any challenge to arbitrability. *See Rock–Tenn Co. v. United Paperworkers Int'l Union*, 184 F.3d 330, 334

(4th Cir.1999) (holding that parties "can manifest their agreement to arbitrate by conduct, for example by submitting without objection to arbitration of a dispute.").

As a subset of the first question, the parties also dispute whether they agreed to arbitrate the issue of arbitrability. The arbitrator did consider whether the underlying dispute was subject to arbitration and found that it was. If the parties did not agree to arbitrate arbitrability, then I must decide arbitrability independently, rather than give deference to the arbitrator's finding that the underlying dispute was subject to arbitration. *See First Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 943, 115 S.Ct. 1920, 131 L.Ed.2d 985 (1995).

■ It is established that "[c]ourts should not assume that the parties agreed to arbitrate arbitrability unless there is 'clea[r] and unmistakabl[e]' evidence that they did so." *Id.* at 944, 115 S.Ct. 1920 (quoting *AT & T Technologies, Inc. v. Communications Workers*, 475 U.S. 643, 649, 106 S.Ct. 1415, 89 L.Ed.2d 648 (1986)). The CBA in this case is silent on the issue of the arbitration of arbitrability.[4] Moreover, the Company did not passively consent to the authority of the arbitrator, unlike the company in the labor dispute in the *Rock–Tenn Co.* case relied upon by the Union. In that case the court pointed out that

**2.** In January 2003 the Company reinstated the Company's match for all Thrift Plan participants, including the Chilhowie employees.

**3.** While in such a circumstance the court might have the power to then decide the contract issue de novo, the parties have not requested any such relief. The only relief requested in Kennametal's Complaint is to vacate the arbitrator's award and in the Union's Counterclaim the only relief requested is to enforce the award.

**4.** A general arbitration clause is insufficient evidence of an agreement to arbitrate arbitrability. *See Carson v. Giant Food, Inc.,* 175 F.3d 325, 329 (4th Cir.1999) (holding that even "broad arbitration clauses that generally commit all interpretive disputes [to arbitration] do not satisfy the clear and unmistakable test.").

Rock–Tenn never objected in any manner to the arbitrator's authority to resolve the question of whether such a [contract] breach had occurred. Because Rock–Tenn thus clearly and unmistakably evidenced its intent to have the arbitrator determine the arbitrability and merits of this dispute, it cannot now maintain "that the arbitrator had no authority to resolve it."

*Rock–Tenn Co.,* 184 F.3d at 336 (citation omitted). Here the Company specifically argued in the arbitration proceeding that the underlying dispute was not subject to arbitration.

■ I thus do not find clear and unmistakable evidence that the parties agreed to arbitrate arbitrability and accordingly I must determine arbitrability de novo. Unlike the question of whether arbitrability is subject to arbitration, however, as to the question of whether the underlying dispute is arbitrable the presumption is reversed— that is, any doubt should be resolved *in favor of arbitration. See First Options of Chicago, Inc.,* 514 U.S. at 944–45, 115 S.Ct. 1920.

■ Based on that presumption, I find that this contract issue is subject to arbitration. The Company argues that Article 17.6 excludes this dispute from arbitration, because it involves a question of "benefit administration" under the Thrift Plan and not a question of "benefit levels." While the plain meaning of "benefit levels" would appear to include the elimination of the employer match here, the Company contends that in light of the bargaining history the words refer only to situations where an employee benefit plan or program is abolished. The Company asserts, in other words, that had it eliminated the Thrift Plan in its entirety for its Chilhowie employees, then and only then would the dispute have been subject to arbitration under the CBA.

While the Company's argument is plausible, I find that it does not carry the day as to arbitrability for two principal reasons—first, the strong presumption in favor of submitting labor disputes to arbitration, and secondly, the plain language of the CBA requiring arbitration of reductions in "benefit levels." It may be that the parties intended that this language apply only to particular benefits plans in gross and not to specific requirements within those plans. Nevertheless, it is hard to construe a "level" as anything other than a particular monetary benefit supplied by the Company. As held by the Supreme Court in a seminal case on this subject, arbitration is required "unless it can be said with positive assurance that the arbitration clause [of the CBA] is not susceptible of an interpretation that covers the asserted dispute." *United Steelworkers v. Warrior & Gulf Navigation Co.,* 363 U.S. 574, 582–83, 80 S.Ct. 1347, 4 L.Ed.2d 1409 (1960). The presumption of arbitrability "dictates that any ambiguity in the scope of the [contract's] arbitration clause be resolved in favor of arbitration." *Porter Hayden Co. v. Century Indem. Co.,* 136 F.3d 380, 382 (4th Cir.1998). Based on all of the circumstances of this case, I cannot say with positive assurance that the agreement of the parties prohibits the arbitration of the present underlying dispute.

### III

Because I find that the dispute in question was subject to arbitration, the remaining question is whether the arbitrator's award in this case on the merits should be vacated or enforced.

■ The Supreme Court has long held that judges may not overrule an arbitrator's award simply because they believe that their own interpretation of the facts or the collective bargaining agreement would be preferable. *See W.R. Grace &*

Co. v. Local Union 759, Int'l Union of United Rubber Workers, 461 U.S. 757, 764–66, 103 S.Ct. 2177, 76 L.Ed.2d 298 (1983). Because courts are instructed to defer to arbitrators' contractual interpretations and fact finding, challenges to the merits of an arbitrator's award "must be considered presumptively unjustified." *United Food & Commercial Workers, Local 400 v. Marval Poultry Co.*, 876 F.2d 346, 351 (4th Cir.1989). As the Supreme Court explained in *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38, 108 S.Ct. 364, 98 L.Ed.2d 286 (1987):

> [A]s long as the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority, that a court is convinced that he committed serious error does not suffice to overturn his decision.

■ On the other hand, an arbitration award should be overturned if it does not "draw[ ] its essence from the collective bargaining agreement." *United Steelworkers v. Enterprise Wheel & Car Corp.*, 363 U.S. 593, 597, 80 S.Ct. 1358, 4 L.Ed.2d 1424 (1960). Among other things, this means that "an award that ignores the plain and unambiguous language of the arbitration contract does not 'draw its essence' from the agreement, and may therefore be overturned ...." *Norfolk & W. Ry. v. Transp. Communications Int'l Union*, 17 F.3d 696, 700 (4th Cir.1994) (citations omitted). In keeping with that principle of labor law, Article 17.4 of the CBA in the present case expressly provides that no arbitration decision "shall add to, subtract from, or alter the terms of this agreement."

■ The Company argues that the arbitration award here did not draw its essence from the CBA because the arbitrator held that he did not have to consider the terms of the Thrift Plan that allowed the Company to discontinue contributions, even though the CBA expressly provided that the Thrift Plan "is part of the Agreement." I agree with the Company.

The arbitrator found that this provision of the Thrift Plan allowing the Company to discontinue contributions was never discussed during negotiations between the parties and that a written copy of the Thrift Plan containing the provision was not provided to the Union until after the CBA had been ratified by the Union membership and signed by the parties. Accordingly, the arbitrator held the Union was not bound by the Thrift Plan because "neither the Union nor employees were made aware of the contents of the plan document ...." (Opinion & Award 10.) The Company disputes this finding, claiming that the Union was in fact provided a copy of the Thrift Plan on at least two occasions prior to ratification of the CBA, once to Jeannette Stump in May of 1998 and once to Guy Hartless in October of 1998. Indeed, the arbitrator recited in his opinion that Jamison had testified at the arbitration hearing that he had delivered a copy of the Thrift Plan to Hartless prior to the ratification.[5] The arbitrator did not reconcile this testimony with his finding that the Union did not receive the language of the Thrift Plan until after ratification. Presumably the arbitrator simply disbelieved Jamison in this regard, although he did not expressly say so.

In spite of the Company's claim that the arbitrator was wrong in finding that the Union did not receive the plan document, I am not permitted to overturn erroneous factual determinations by an arbitrator and thus I assume for the purposes of this case that the arbitrator was correct that the Union did not know of the specific language of the Thrift Plan until after it had agreed to the terms of the CBA. Nev-

---

**5.** There is no transcript of the arbitration hearing in the record.

ertheless, the arbitrator's refusal to even consider the language of the Thrift Plan requires that his award be set aside.

 There is no claim—and the arbitrator did not find—that the language of the Thrift Plan was concealed or misrepresented or that the Company refused upon request to supply needed information to the Union. The Thrift Plan was expressly made "part of the [CBA]" and by ignoring its contents "the arbitrator simply fail[ed] to do his job." *United States Postal Serv. v. Am. Postal Workers Union,* 204 F.3d 523, 527 (4th Cir.2000). It is settled law that "[a] party who signs a written agreement is bound by its terms, even though the party neither reads the agreement nor considers the legal consequences of signing it." *Employee Painters' Trust v. J & B Finishes,* 77 F.3d 1188, 1192 (9th Cir. 1996). There was no requirement under federal labor law for the Company to separately negotiate the terms of the Thrift Plan before it became part of the CBA. *See BP Amoco Corp. v. NLRB,* 217 F.3d 869, 874 (D.C.Cir.2000) (construing employer's medical plan adopted in collective bargaining agreement).

Of course, the fact that the terms of the Thrift Plan are binding does not automatically mean that the Union's grievance is not well founded. The arbitrator might have determined that the proper construction of the CBA and the Thrift Plan together is that the Company had the power to suspend the matching contribution but that under the provisions of Article 17.6 it was required to first discuss the change with the Union and negotiate a comparable replacement benefit. Whether that is the correct interpretation of the parties' agreement is up to an arbitrator and not the courts. Nevertheless, it was error for the arbitrator to ignore the terms of the Thrift Plan in reaching his decision.

## IV

For these reasons, I will remand the case for another arbitration of the grievance before a different arbitrator. While I have no doubt of the arbitrator's good faith, I believe that the appearance of impartiality requires a new adjudicator. *See Grand Rapids Die Casting Corp. v. Local Union No. 159, UAW,* 684 F.2d 413, 416–17 (6th Cir.1982). A separate judgment consistent with this opinion is being entered herewith.